464 F.3d 362
 BUFFALO TEACHERS FEDERATION, Buffalo Educational Support Team, NEA/NY, Transportation Aides of Buffalo, NEA/NY, Substitutes United Buffalo NEA/NY, Buffalo Council of Supervisors and Administrators, AFSCME Local 264, Professional Clerical and Technical Employees' Association and Local 409 International Union Operating Engineers, Plaintiffs-Appellants,
v.
Richard TOBE, Thomas E. Baker, Alair Townsend, H. Carl McCall, John J. Faso, Joel A. Giambra, Mayor Anthony Masiello, Richard A. Stenhouse, Roger G. Wilmers, in their official capacities as directors/members of the Buffalo Fiscal Stability Authority and George E. Pataki, Defendants-Appellees.
Docket No. 05-4744-cv.
 United States Court of Appeals, Second Circuit.
 Argued March 7, 2006.
 Decided September 21, 2006.
 
 COPYRIGHT MATERIAL OMITTED Andrew D. Roth, Bredhoff & Kaiser, Washington, D.C. (Laurence Gold, Bredhoff & Kaiser, P.L.L.C., Washington, D.C.; Robert H. Chanin, National Education Association, Washington, D.C., of counsel), for Plaintiffs-Appellants.
 A. Vincent Buzard, Pittsford, New York (Paul R. Braunsdorf, Laura W. Smalley, Harris Beach PLLC, Pittsford, New York, of counsel), for Defendants-Appellees.
 Before CARDAMONE, CALABRESI, and HALL, Circuit Judges.
 CARDAMONE, Circuit Judge.
 When a state is sued for allegedly impairing the contractual obligations of one of its political subdivisions even though it is not a signatory to the contract, the state will not be held liable for violating the Contracts Clause of the United States Constitution unless plaintiffs produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct. On this issue, plaintiffs have the burden of proof because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern. In the appeal before us, the record of why the state acted is available, and plaintiffs have not met their burden.
 Plaintiffs are the Buffalo Teachers Union and a number of other unions in Buffalo, New York (Buffalo or City), representing public employees of the school district of the City of Buffalo — including teachers, principals, bus drivers, cooks, food service helpers, etc. (plaintiffs, unions, or appellants). Defendants are the Buffalo Fiscal Stability Authority (Buffalo Fiscal Authority, BFSA, or Board), its members, and New York State Governor George E. Pataki (collectively defendants). Plaintiffs, alleging that a wage freeze instituted by defendant Buffalo Fiscal Authority violates the Contracts Clause and the Takings Clause of the United States Constitution, sued defendants and sought a declaratory judgment with respect to the wage freeze's constitutionality and also an injunction against its enforcement. Both sides moved for summary judgment. The United States District Court for the Western District of New York (Skretny, J.) granted summary judgment for defendants in a judgment dated and entered August 19, 2005.
 
 BACKGROUND
 A. Buffalo's Fiscal Crisis & Comptroller's Report
 
 1
 When in 2003 the speaker of the New York State Assembly became concerned by Buffalo's declining financial health, he requested the state comptroller's office to conduct a review of the City's finances. The resulting report detailed Buffalo's financial situation. The report recounted that the City had been operating for several years with a structural deficit and had been able to continue operations only with state aid and the use of the City's reserves. Buffalo had relied increasingly on state aid to fund its budget increases (state aid grew from $67 million in 1997-98 to $128 million in 2002-03). The City faced exponential increases in its budget deficits; the comptroller projected budget deficits of $7.5 million for 2002-03, $30-$46 million for 2004-05, $76-$107 million for 2005-06, and $93-$127 million for 2006-07.
 
 
 2
 Based on these and other bleak findings, the comptroller concluded Buffalo was not in a position to resolve its fiscal woes on its own. For example, the record on this appeal shows that to remedy budgetary shortfalls, the City had already laid off 800 teachers and 250 assistant teachers over a four year period. The report therefore suggested legislative intervention. Specifically, the comptroller recommended the creation of a control board — namely the BFSA — to oversee Buffalo's finances. The board would have powers and duties similar to those given to boards that already oversaw the budgets of other fiscally troubled municipalities in New York State. The comptroller advised also that in the event of a board-declared fiscal crisis the board should have the power to freeze future wage increases.
 
 B. Buffalo Fiscal Stability Authority Act
 
 3
 In light of the comptroller's report, the state legislature passed on July 3, 2003 the Buffalo fiscal stability authority act (Act) to address the City's financial crises. See N.Y. Pub. Auth. Law § 3850-a (McKinney Supp.2006). To explain passage of the Act, the legislature stated,
 
 
 4
 It is hereby found and declared that the city [of Buffalo] is in a state of fiscal crisis, and that the welfare of the inhabitants of the city is seriously threatened. The city budget must be balanced and economic recovery enhanced. Actions should be undertaken which preserve essential services to city residents, while also ensuring that taxes remain affordable. Actions contrary to these two essential goals jeopardize the city's long-term fiscal health and impede economic growth for the city, the region, and the state.
 
 
 5
 See 2003 N.Y. Sess. Laws Ch. 122 § 5695 (McKinney) (emphasis added); see also N.Y. Pub. Auth. Law § 3850-a (McKinney Supp.2006) (setting forth legislative declaration of need for state intervention).
 
 
 6
 The aim of the Act is to have Buffalo achieve fiscal stability by 2007-08. See N.Y. Pub. Auth. Law § 3857(1) (McKinney Supp.2006). To attain that goal, the Act created the Buffalo Fiscal Authority, a public benefit corporation. See id. § 3852(1). Central to the Act is a requirement that the City submit financial plans each year over a four year period to the Buffalo Fiscal Authority for approval. See id. §§ 3856 & 3857. Under the terms of the Act, the Board is to review, approve, and monitor implementation of the City's financial plans to ensure that the City is abiding by the fiscal limitations and benchmarks imposed by the Act. See id. §§ 3856-59. The Act also provides a means by which the Board may modify the financial plans to bring them into compliance with the Board's strictures. Id. § 3857. If Buffalo fails or refuses to modify its financial plans, the Board may take corrective steps on its own. Id. § 3857(2), 3858(2). In particular, the Board may impose a wage and/or hiring freeze upon a finding that such a freeze is "essential to the adoption or maintenance of a city budget or a financial plan" that is in compliance with the Act. Id. § 3858(2)(c)(i).
 
 C. Imposition of the Wage Freeze
 
 7
 On October 21, 2003 the Buffalo Fiscal Authority approved the City's first four-year financial plan under the Act. Prior to the submission of the plan, the Board had already ordered the City to institute a hiring freeze and had also instructed the City to exclude from the plan wage increases that were not contractually required. The City approved a tax increase for its 2004-05 budget and planned for another tax increase in the last year of the four-year plan; together the city tax increases amounted to $6.3 million.
 
 
 8
 Six months later, in reviewing how the plan's implementation was proceeding, the Board realized the plan no longer complied with the Act. The BFSA discovered that for the 2004-05 fiscal year Buffalo projected a budget gap $20 million greater than the $30 million gap previously estimated. The Board was further troubled by the estimate that the projected City budget gap for the next four years would exceed $250 million.
 
 
 9
 As a result of these concerns, on April 21, 2004 the Buffalo Fiscal Authority invoked its wage freeze power and determined "that a wage freeze, with respect to the City and all Covered Organizations, is essential to the maintenance of the Revised Financial Plan and to the adoption and maintenance of future budgets and financial plans that are in compliance with the Act." The Board further resolved that "effective immediately, there shall be a freeze with respect to all wages . . . for all employees of the City [which] shall apply to prevent and prohibit any increase in wage rates." The wage freeze took effect that day, and effectively prohibited members of the plaintiff unions from enjoying a two percent wage increase that the unions had negotiated as part of their labor contracts with the City.
 
 D. Prior Proceedings
 
 10
 Following the imposition of the wage freeze, plaintiffs filed suit against the Board on June 17, 2004 in the district court, seeking a judgment declaring the wage freeze unconstitutional under the Contracts and Takings Clauses, and seeking an injunction to bar the wage freeze's enforcement. On February 28, 2005 the parties filed cross-motions for summary judgment. After full briefing and oral argument, the district court denied plaintiffs' motion and granted summary judgment in favor of the defendants. It held that as a matter of law the wage freeze offended neither the Contracts or Takings Clauses of the Constitution. From the district court's judgment, plaintiffs appeal.
 
 DISCUSSION
 I Standard of Review
 
 11
 Our standard of review here is well known. We review the grant of summary judgment de novo, Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 262 (2d Cir.2001), viewing the facts in the light most favorable to plaintiffs and resolving all factual ambiguities in their favor, Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir.2006). Under this standard, we are only to "determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). With this in mind, we turn to plaintiffs' claims.
 
 II Contracts Clause
 
 12
 We begin with that part of the appeal relating to the Contracts Clause, a provision of the Constitution that even prior to its adoption was at the center of heated discourse. After 11 states had ratified the Constitution, James Madison lamented privately to Thomas Jefferson that the articles relating to treaties, paper money, and contracts "created more enemies than all the errors in the System positive & negative put together." Akhil Reed Amar, America's Constitution: A Biography 124 (Random House 2005) (quoting letter from James Madison to Thomas Jefferson, Oct. 17, 1788, in Madison, Papers, 11:297).
 
 
 13
 Our attention turns to this clause, which provides that no state shall pass any law "impairing the Obligation of Contracts." U.S. Const. art. 1, § 10. Although facially absolute, the Contracts Clause's prohibition "is not the Draconian provision that its words might seem to imply." Allied Structural Steel Co. v. Spannaus (Spannaus), 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). It does not trump the police power of a state to protect the general welfare of its citizens, a power which is "paramount to any rights under contracts between individuals." Id. at 241, 98 S.Ct. 2716; see also W.B. Worthen Co. v. Thomas, 292 U.S. 426, 433, 54 S.Ct. 816, 78 L.Ed. 1344 (1934) ("[L]iteralism in the construction of the contract clause . . . would make it destructive of the pubic interest by depriving the State of its prerogative of self-protection."). Rather, courts must accommodate the Contract Clause with the inherent police power of the state "to safeguard the vital interests of its people." Home Bldg. & Loan Ass'n v. Blaisdell (Blaisdell), 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934); see also Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 992-93 (2d Cir.1997). Thus, state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim, see U.S. Trust Co. v. New Jersey, 431 U.S. 1, 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).
 
 
 14
 To determine if a law trenches impermissibly on contract rights, we pose three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary. Energy Reserves Group, 459 U.S. at 411-13, 103 S.Ct. 697; Sanitation & Recycling Indus., 107 F.3d at 993. We also consider the level of deference to give to a legislature's determination that a law was reasonable and necessary. We address each of these questions.
 
 A. Substantial Impairment and Legitimate Public Purpose
 
 15
 We discuss questions (1) and (2) together. First, we agree with the district court that the wage freeze substantially impairs the unions' labor contracts with Buffalo. To assess whether an impairment is substantial, we look at "the extent to which reasonable expectations under the contract have been disrupted." Sanitation & Recycling Indus., 107 F.3d at 993. Contract provisions that set forth the levels at which union employees are to be compensated are the most important elements of a labor contract. The promise to pay a sum certain constitutes not only the primary inducement for employees to enter into a labor contract, but also the central provision upon which it can be said they reasonably rely. With that in mind, we may safely state the wage freeze so disrupts the reasonable expectations of Buffalo's municipal school district workers that the freeze substantially impairs the workers' contracts with the City. See Ass'n of Surrogates and Sup.Ct. Reporters v. New York (Surrogates), 940 F.2d 766, 772 (2d Cir.1991) (noting that a statute affecting timing of payment of salary substantially impaired public employees' contract).
 
 
 16
 Second, we next ask if the legislature had a legitimate public purpose in passing the Act and providing for a wage freeze. When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law. See Energy Reserves Group, 459 U.S. at 411-12, 103 S.Ct. 697; Sanitation & Recycling Indus., 107 F.3d at 993. A legitimate public purpose is one "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." Sanitation & Recycling Indus., 107 F.3d at 993. And as discussed in a moment, the purpose may not be simply the financial benefit of the sovereign.
 
 
 17
 The New York legislature had a legitimate public purpose in passing the Act and its wage freeze power. It is not disputed that Buffalo was suffering at the time, and continues to suffer, a fiscal crisis. The state legislature passed the Act to address specifically the City's financial problems. See N.Y. Pub. Auth. Law § 3850-a (McKinney Supp.2006) (declaring that "the city of Buffalo is facing a severe fiscal crisis, and that the crisis cannot be resolved absent assistance from the state"). This is not a case in which the Act and wage freeze were passed "for the mere advantage of particular individuals," Blaisdell, 290 U.S. at 445, 54 S.Ct. 231; rather, the legislature passed the law "for the protection of a basic interest of society," id. Further, courts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest. See, e.g., id. at 444-48, 54 S.Ct. 231 (statute impairing mortgages found to be constitutional in light of depression era exigencies); In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth. (Subway-Surface), 44 N.Y.2d 101, 112-14, 404 N.Y.S.2d 323, 375 N.E.2d 384 (1978) (statute freezing municipal wages held to be constitutional given fiscal emergency afflicting New York City). We find no reason in the instant case to reach a conclusion contrary to that reached in the cited cases.
 
 B. Reasonableness and Necessity
 
 18
 That a contract-impairing law has a legitimate public purpose does not mean there is no Contracts Clause violation. The impairment must also be one where the means chosen are reasonable and necessary to meet the stated legitimate public purpose. U.S. Trust Co., 431 U.S. at 22-23, 97 S.Ct. 1505; see Sanitation & Recycling Indus., 107 F.3d at 993 ("A law that works substantial impairment of contractual relations must be specifically tailored to meet the societal ill it is supposedly designed to ameliorate."). If it is not, then the law offends the Contracts Clause.
 
 
 19
 Unless the state itself is a party to the contract, courts usually defer to a legislature's determination as to whether a particular law was reasonable and necessary. See Energy Reserves, 459 U.S. at 412-13, 103 S.Ct. 697. In this appeal, the parties committed the majority of their arguments in their briefs to discussing the appropriate level of deference our court owes to the legislature here. Therefore, before we can answer the third question of reasonableness and necessity, we first address the issue of deference.
 
 1. Kinds of Deference
 
 20
 Since Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), it has been familiar law that the Contracts Clause applies to public contracts as well as to private contracts. Id. at 694 (recognizing that salary contracts of public officers are entitled to Contracts Clause protection) (Marshall, C.J.); see U.S. Trust Co., 431 U.S. at 17, 97 S.Ct. 1505, 52 L.Ed.2d 92. However, in analyzing public contracts courts use a different approach than that employed in analyzing private ones. When a law impairs a private contract, substantial deference is accorded, see Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 54 (2d Cir.1998), to the legislature's "judgment[s] as to the necessity and reasonableness of a particular measure," U.S. Trust Co., 431 U.S. at 23, 97 S.Ct. 1505. Public contracts are examined through a more discerning lens. When the state itself is a party to a contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the [s]tate's self-interest is at stake." Id. at 26, 97 S.Ct. 1505. When a state's legislation is self-serving and impairs the obligations of its own contracts, courts are less deferential to the state's assessment of reasonableness and necessity. Condell v. Bress, 983 F.2d 415, 418 (2d Cir.1993).
 
 
 21
 The parties disagree with respect to what level of deference we should apply. Plaintiffs argue that we owe little deference to the state's decision because the Act is, in their view, self-serving to the state, while defendants insist we owe substantial deference to the legislative judgment. Of particular significance in the case at hand is the absence of a contract to which New York State is a party. Defendants contend that substantial deference is due because New York State is not a party to the contracts that are being impaired, that is, the state did not impair the obligations of its own contracts. Id. at 418. Plaintiffs concede that their contracts are with the City of Buffalo and that no state contracts or obligations run to them or to the City. But, they assert, that absence of a state contract does not preclude heightened scrutiny. The plaintiff unions urge us to focus on the alleged self-serving nature of the Act and the wage freeze. They argue that a less deferential standard applies because the wage freeze is in plaintiffs' view, self-serving insofar as it may save the state money by reducing future aid the state may feel obliged to give to the City.
 
 
 22
 Our initial comment is that the presence or absence of a state as a party to the contract is not determinative of the deference issue. Defendants ignore that a public contract is in fact being impaired albeit through state rather than local law. Were we to adopt defendants' reading, state legislatures could delegate to an agency the power to impair a public contract of a government subdivision that the subdivision itself would have more difficulty impairing. Lawmakers could fashion the powers delegated to the agency in a manner to insulate the agency's actions from constitutional attack. We decline to open such an end-run around Contracts Clause law. The better rule therefore calls for focusing on whether the contract-impairing law is self-serving, where existence of a state contract is some indicia of self-interest, but the absence of a state contract does not lead to the converse conclusion.
 
 
 23
 In other words, the absence of a contract with the state does not mean we thereby believe the wage freeze cannot be self-serving to the state. To the contrary, it can be. But, in the end, we do not think this is the sort of case in which the state legislature "welches" on its obligations as a matter of "political expediency," see Surrogates, 940 F.2d at 773; Guido Calabresi, Retroactivity: Paramount Powers & Contractual Changes, 71 Yale L.J. 1191, 1201-02 (1962), but rather, the state was genuinely acting for the public good, see Blaisdell, 290 U.S. at 445, 54 S.Ct. 231; Calabresi, 71 Yale L.J. at 1202. For the purposes of this appeal, we need not resolve what level of deference to apply. Instead, we will assume that the lower level of deference applies because, as discussed below, the wage freeze is reasonable and necessary even under the less deferential standard.
 
 2. What Does Less Deference Mean?
 
 24
 As stated above, assuming the state's legislation was self-serving to the state, we are less deferential to the state's assessment of reasonableness and necessity than we would be in a situation involving purely private contracts, but what does giving less deference to the legislature actually mean? We hasten to point out that less deference does not imply no deference. See Local Div. 589, Amalgamated Transit Union v. Massachusetts, 666 F.2d 618, 643 (1st Cir.1981) (Breyer, J.) ("[W]here economic or social legislation is at issue, some deference to the legislature's judgment is surely called for."); Subway-Surface, 44 N.Y.2d at 112, 404 N.Y.S.2d 323, 375 N.E.2d 384 (noting that "the statement of the principle [in U.S. Trust Co.] implies that some deference at least is appropriate"). Relatedly, we agree with the First Circuit that U.S. Trust Co. does not require courts to reexamine all of the factors underlying the legislation at issue and to make a de novo determination whether another alternative would have constituted a better statutory solution to a given problem. See Local Div. 589, 666 F.2d at 642. Nor is the heightened scrutiny to be applied as exacting as that commonly understood as strict scrutiny. Such a high level of judicial scrutiny of the legislature's actions would harken a dangerous return to the days of Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), overruled, see Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952), in which courts would act as superlegislatures, overturning laws as unconstitutional when they "believe[d] the legislature [] acted unwisely," Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); see Peick v. Pension Benefit Guar. Corp., 724 F.2d 1247, 1265 (7th Cir.1983) ("The danger of heightened scrutiny, and the reason it has been as sparingly applied since its heyday in the Lochner era, is that it can easily mask the imposition by a court of a philosophical and economic straightjacket on the legislature."); see also Laurence H. Tribe, Constitutional Choices 182 (1985) (equating heightened scrutiny under the Contracts Clause as backdoor to Lochner-type jurisprudence). The Lochner doctrine, of course, "has long since been discarded." Skrupa, 372 U.S. at 730, 83 S.Ct. 1028.
 
 
 25
 Ultimately, for impairment to be reasonable and necessary under less deference scrutiny, it must be shown that the state did not (1) "consider impairing the ... contracts on par with other policy alternatives" or (2) "impose a drastic impairment when an evident and more moderate course would serve its purpose equally well," nor (3) act unreasonably "in light of the surrounding circumstances," U.S. Trust Co., 431 U.S. at 30-31, 97 S.Ct. 1505.
 
 3. The Wage Freeze is Reasonable and Necessary
 
 26
 With the above standard in mind, we hold the wage freeze was reasonable and necessary. The legislature and Board did not treat the wage freeze on par with other policy alternatives. According to the Act, the Buffalo Fiscal Authority was empowered to enact the wage freeze provision only if it was essential to maintenance of the City's budget. N.Y. Pub. Auth. Law § 3858(2)(c) (McKinney Supp.2006). We read this to mean the wage freeze must have been a last resort measure. Indeed the Board imposed the freeze only after other alternatives had been considered and tried. The Board first instituted a hiring freeze pursuant to its powers under the Act. Moreover, the City had already taken other more drastic measures including school closings and layoffs; in the four years prior to the wage freeze Buffalo eliminated 800 teaching and 250 teaching assistant positions. Only after these more drastic steps were taken and a finding that the freeze was essential was made, did the BFSA institute the wage freeze.
 
 
 27
 This discussion dovetails with the second question of whether a more moderate course was available to remedy the fiscal crisis. As noted, the alternatives to the wage freeze consisted of elimination of more municipal jobs and school closures, alternatives which clearly are more drastic than a temporary wage freeze. Thus, in light of the surrounding circumstances, we cannot say the state or the Buffalo Fiscal Authority acted unreasonably.
 
 
 28
 The temporary and prospective nature of the wage freeze underscores further its reasonableness. The Supreme Court instructs that the extent of the impairment is "a relevant factor in determining its reasonableness." U.S. Trust Co., 431 U.S. at 27, 97 S.Ct. 1505. Here the impairment is relatively minimal. Under the terms of the Act, the temporary wage freeze must be revisited by the Board on an on-going basis to assure the freeze's continued necessity. N.Y. Pub. Auth. Law § 3858(2)(d) (McKinney Supp.2006). Further, the wage freeze operates prospectively. In this respect the present facts are dissimilar to U.S. Trust Co., a case that represents the paradigm of the type of protection that the Contracts Clause was designed to offer: protection "to those who invested money, time and effort against loss of their investment through explicit repudiation." Local Div. 589, 666 F.2d at 642 (discussing U.S. Trust Co.). The impairment here does not affect past salary due for labor already rendered or money invested. It only suspends temporarily the two percent increase in salary for services to be rendered.
 
 
 29
 In sum, the prospective and temporary quality of the wage freeze convinces us of its reasonableness. See Blaisdell, 290 U.S. at 447, 54 S.Ct. 231 (finding temporary nature of an impairment to be probative of reasonableness) accord Spannaus, 438 U.S. at 242-43, 98 S.Ct. 2716; Subway-Surface, 44 N.Y.2d at 112-14, 404 N.Y.S.2d 323, 375 N.E.2d 384 (attaching significance to the prospective characteristic of a law impairing public contracts); cf. Energy Reserves Group, 459 U.S. at 418-19, 103 S.Ct. 697 (finding as probative the temporary aspect of an impairing regulation in a private contract case).
 
 
 30
 The unions argue the wage freeze was unnecessary because other alternatives existed. Namely, taxes could have been raised or other programs and services could have been eliminated or burdened. We cannot adopt this position for at least three reasons. First, it is always the case that to meet a fiscal emergency taxes conceivably may be raised. It cannot be the case, however, that a legislature's only response to a fiscal emergency is to raise taxes. Also, defendants have shown that Buffalo had already increased City taxes to meet its fiscal needs, and it is reasonable to believe that any additional increase would have further exacerbated Buffalo's financial condition. Second, even if the state could have raised its taxes, appellants have not shown how any monies so raised would flow to Buffalo. Finally, on the undisputed facts of this case, we find no need to second-guess the wisdom of picking the wage freeze over other policy alternatives, especially those that appear more Draconian, such as further layoffs or elimination of essential services. See Blaisdell, 290 U.S. at 447-48, 54 S.Ct. 231 ("Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."); Local Div. 589, 666 F.2d at 643 (noting that the court could have balanced alternatives to impairment, but concluding that "[a]nswering these sorts of questions ... is a task far better suited to legislators than to judges"); see also Sal Tinnerello & Sons, 141 F.3d at 54 ("[I]t is not the province of this Court to substitute its judgement for that of ... a legislative body.").
 
 4. Present Case Distinguishable From Surrogates and Condell
 
 31
 We pause here to discuss why, contrary to the plaintiffs' assertions, this case is distinguishable from Association of Surrogates & Supreme Court Reporters v. New York and Condell v. Bress. In Surrogates, New York State had allegedly impaired the labor contracts of certain judicial employees by instituting a payroll lag in which payment of their salaries would be delayed. Surrogates, 940 F.2d at 769. Condell involved a similar payroll lag that affected employees of the state executive branch. Condell, 983 F.2d at 417. Applying heightened Contracts Clause scrutiny, we held both payroll lag provisions unreasonable and unnecessary. See Condell, 983 F.2d at 418, 419-20; Surrogates, 940 F.2d 773-74.
 
 
 32
 The facts and circumstances of those cases nonetheless are dissimilar to those present here. In those cases we found the legislature's justifications of reasonableness and necessity to be dubious at best. That there was an emergency or dire need justifying the impairment was in doubt in those cases. See, e.g., Surrogates, 940 F.2d at 773 (assuming for argument sake only that expansion of the judiciary is an important public purpose but holding payroll lag not to be necessary to achieving that goal); Condell, 983 F.2d at 420 (implying that a fiscal crisis could be grave enough where a state might constitutionally impose a payroll lag but finding that the case before the court did not present such an emergency). For example, in Surrogates the state wanted to hire more judicial employees to help reduce the courts' back-log of cases. Surrogates, 940 F.2d 768-69. To fund this endeavor it instituted the payroll lag, rather than raise taxes to fund the additional service. Id. at 773. We determined that the lawmakers had impaired the state employees' contracts improperly, in part, on the basis of this political expediency. See id.; Condell, 983 F.2d at 420.
 
 
 33
 Here, no one questions the existence of a very real fiscal emergency in Buffalo. Additionally, as noted, there is no evidence in the record of an ill-motive of political expediency or unjustified welching. Contracts Clause cases involve individual inquiries, for no two cases are necessarily alike. See Blaisdell, 290 U.S. at 430, 54 S.Ct. 231 ("Every case must be determined upon its own circumstances."). In the present case, we are comfortable that the wage freeze is reasonable and necessary to remedy the fiscal instability of Buffalo.
 
 
 34
 We point out that while the facts of Surrogates and Condell are inapposite, we find the New York state case, In re Subway-Surface Supervisors Association v. New York City Transit Authority, to be persuasive and relevant. In Subway-Surface, the New York Court of Appeals upheld the constitutionality of the New York State Financial Emergency Act for the City of New York, a state law which, like the wage freeze here, suspended wage increases of municipal workers. 44 N.Y.2d at 107-08, 404 N.Y.S.2d 323, 375 N.E.2d 384. At the time, New York City was in the midst of a financial emergency, and to address the emergency, the state froze New York City municipal wages. Id. We find the instant case similar, especially because the fact of an emergency is not contested. Our holding can be summarized simply: An emergency exists in Buffalo that furnishes a proper occasion for the state and BFSA to impose a wage freeze to "protect the vital interests of the community," and the existence of the emergency "cannot be regarded as a subterfuge or as lacking in adequate basis." Blaisdell, 290 U.S. at 444, 54 S.Ct. 231. Nor can the wage freeze be regarded as unreasonable or unnecessary to achieve the important public purpose of stabilizing Buffalo's fiscal position.
 
 III Takings Clause
 
 35
 Plaintiffs appeal also the district court's denial of their Takings Clause claim. While we hold that no takings violation has occurred, we do so on different grounds than those relied on by the district court.
 
 A. Physical Taking or Regulatory Taking
 
 36
 The Takings Clause of the Fifth Amendment provides that no "private property shall be taken for public use, without just compensation." U.S. Const. amend. V. The clause applies to the states through the Fourteenth Amendment. See Kelo v. New London, 545 U.S. 469, 125 S.Ct. 2655, 2658 n. 1, 162 L.Ed.2d 439 (2005).
 
 
 37
 The law recognizes two species of takings: physical takings and regulatory takings. See Meriden Trust & Safe Deposit Co. v. FDIC, 62 F.3d 449, 454 (2d Cir. 1995). Physical takings (or physical invasion or appropriation cases) occur when the government physically takes possession of an interest in property for some public purpose. Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). The fact of a taking is fairly obvious in physical takings cases: for example, the government might occupy or take over a leasehold interest for its own purposes, see United States v. Gen. Motors Corp., 323 U.S. 373, 375, 380, 65 S.Ct. 357, 89 L.Ed. 311 (1945), or the government might take over a part of a rooftop of an apartment building so that cable access may be brought to residences within, see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 421, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). But when the government acts in a regulatory capacity, such as when it bans certain uses of private property, see Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 384-85, 47 S.Ct. 114, 71 L.Ed. 303 (1926), or limits the rent a landlord may charge tenants, see Fed. Home Loan Mortgage Corp. v. New York State Div. of Hous. & Cmty. Renewal, 83 F.3d 45, 47-48 (2d Cir.1996), or prohibits landlords from evicting tenants for refusing to pay higher rents, see Block v. Hirsh, 256 U.S. 135, 154, 41 S.Ct. 458, 65 L.Ed. 865 (1921), the question of whether a taking has occurred is more complex, Tahoe-Sierra Pres. Council, 535 U.S. at 323, 122 S.Ct. 1465. Such cases are considered regulatory takings because they do not involve a categorical assumption of property. See id. The gravamen of a regulatory taking claim is that the state regulation goes too far and in essence "effects a taking." Meriden Trust & Safe Deposit Co., 62 F.3d at 454.
 
 
 38
 The district court analyzed the wage freeze as a physical taking. We believe this was in error. The wage freeze "does not present the `classic taking' in which the government directly appropriates private property for its own use." Eastern Enters. v. Apfel, 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Rather, the interference with appellants' contractual right to a wage increase "arises from [a] public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The freeze therefore falls into the category of a regulatory, not physical, taking, and should have been analyzed as such. See Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (analyzing Takings Clause case involving "taking" of contracts rights under regulatory takings jurisprudence); see also Tahoe-Sierra Pres. Council, 535 U.S. at 323-24, 122 S.Ct. 1465 (noting that physical invasion line of cases is inapplicable to regulatory takings analysis).
 
 B. Protectable Property
 
 39
 In adjudging whether the Act constituted an unconstitutional taking, we take a moment here to ask the threshold question of whether a protectable property interest is even at stake. Although the Supreme Court has held that valid contracts constitute property under the Takings Clause, Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), this is neither a blanket nor absolute rule, see Connolly, 475 U.S. at 224, 106 S.Ct. 1018 ("[T]he fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking [but][t]his is not to say that contractual rights are never property rights ...."), and further it is a rule that has been called into question, Pro-Eco, Inc. v. Bd. of Comm'rs, 57 F.3d 505, 510 n. 2 (7th Cir.1995) ("We read Connolly . . . as effectively overruling, if it had not already been overruled, Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 [(1934)]."); see also Ohio Student Loan Comm'n v. Cavazos, 900 F.2d 894, 900-02 (6th Cir.1990) (distinguishing Lynch and holding that contract rights are not property); Peick, 724 F.2d 1247, 1274-76 (noting distinction between "property rights" which are protected under Takings Clause and "contract rights" which are not necessarily protected). Our misgivings, however, need not detain us. We will assume for purposes of this appeal that the wage increase provisions of appellants' contracts constitute property under the Takings Clause.
 
 C. Regulatory Taking
 
 40
 Regulatory takings analysis requires an intensive ad hoc inquiry into the circumstances of each particular case. See Connolly, 475 U.S. at 224, 106 S.Ct. 1018. We weigh three factors to determine whether the interference with property rises to the level of a taking: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." Id. at 224-25, 106 S.Ct. 1018. In considering these factors, we are not persuaded that plaintiffs have met the heavy burden necessary to establish a regulatory taking. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 493, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).
 
 
 41
 First, the severity of the economic impact of the freeze and the extent to which it interferes with appellants' investment-backed expectations are relatively small. The wage freeze is temporary and operates only during a control period. See N.Y. Pub. Auth. Law § 3858(2)(d) (McKinney Supp.2006). What is more, this is not a case in which a law abrogates an entire contract. The freeze affects only a small increase in wages. As such plaintiffs continue to receive the same salary they had been receiving prior to the freeze's enactment. The freeze's prospective nature demonstrates also its limited economic impact and interference with appellants' investment-backed expectations. It does not affect wages for which services and labor have already been rendered.
 
 
 42
 Second, the nature of the state's action is uncharacteristic of a regulatory taking. The wage freeze is a negative restriction rather than an affirmative exploitation by the state. Nothing is affirmatively taken by the government. Instead the government annuls something — namely, the appellants' contractual right to a wage increase. The freeze is in this respect like a temporary cap on how much plaintiffs may charge for their services. See Fed. Home Loan Mortgage Corp., 83 F.3d at 48 (upholding rent stabilization as not a taking); Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir.1993) (upholding price regulations that limit how much medical providers may charge Medicare patients).
 
 
 43
 Ultimately, and third, the temporary suspension of plaintiffs' wage increase arises from a public program that undoubtedly burdens the plaintiffs in order to promote the common good. Connolly, 475 U.S. at 225, 106 S.Ct. 1018. Equally true is that the public program to help Buffalo obtain fiscal stability is one which the state had a right to initiate and regulate. We recognize the possibility that the net effect of the wage freeze may well be to take from Peter to pay Paul, but such burden shifting does not, without more, amount to a regulatory taking. See id. at 223, 106 S.Ct. 1018 ("Given the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever the legislation requires one person to use his or her assets for the benefit of another.").
 
 CONCLUSION
 
 44
 Accordingly, for the foregoing reasons, the state law constitutes neither a Contracts Clause nor Takings Clause violation. We therefore affirm the district court's order granting summary judgment in favor of defendants and denying summary judgment to plaintiffs.