IN THE

# United States Court of Appeals

# For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: SEPTEMBER 23, 2019
DECIDED: MAY 13, 2020

Nos. 18-1587-CV (L), 18-1606-CV (CON), 18-1634-CV (CON)

BRIAN SULLIVAN, AS PRESIDENT OF THE NASSAU COUNTY SHERIFF'S CORRECTION OFFICERS BENEVOLENT ASSOCIATION, NASSAU COUNTY SHERIFF'S CORRECTION OFFICERS BENEVOLENT ASSOCIATION, JAMES CARVER, AS PRESIDENT OF THE NASSAU COUNTY POLICE BENEVOLENT ASSOCIATION, GARY LEARNED, AS PRESIDENT OF THE SUPERIOR OFFICERS ASSOCIATION OF NASSAU COUNTY, THOMAS R. WILLDIGG, AS PRESIDENT OF THE NASSAU COUNTY POLICE DEPARTMENT DETECTIVES' ASSOCIATION, INC., JERRY LARICCHIUTA, AS LOCAL PRESIDENT OF CSEA NASSAU COUNTY LOCAL 830, DANNY DONOHUE, AS PRESIDENT OF THE CIVIL SERVICE EMPLOYEES ASSOCIATION INC. LOCAL 1000, AFSCME, AFL-CIO, CIVIL SERVICE EMPLOYEES ASSOCIATION, LOCAL 1000 AFSCME, AFL-CIO,

*Plaintiffs-Appellants,*

*v.*

NASSAU COUNTY INTERIM FINANCE AUTHORITY, RONALD A. STACK, AS CHAIRMAN AND DIRECTOR OF THE NASSAU COUNTY INTERIM FINANCE AUTHORITY, GEORGE J. MARLIN, LEONARD D. STEINMAN, THOMAS W. STOKES, ROBERT A. WILD, CHRISTOPHER P. WRIGHT, AS DIRECTORS OF THE NASSAU COUNTY INTERIM FINANCE AUTHORITY, EDWARD MANGANO, IN HIS OFFICIAL CAPACITY AS COUNTY EXECUTIVE OF NASSAU COUNTY, GEORGE MARAGOS, IN HIS OFFICIAL CAPACITY AS NASSAU COUNTY COMPTROLLER,

*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Eastern District of New York.
Nos. 11-CV-1614, 11-CV-1900, 11-CV-2743 – Joanna Seybert, *District Judge*.

————

Before: CALABRESI, LOHIER, AND PARK, *Circuit Judges*.

————

On March 24, 2011, the Nassau County Interim Finance Authority ("NIFA") instituted a year-long wage freeze for all Nassau County employees. The various unions representing these employees sued NIFA, its directors, and other County leaders, alleging that this wage freeze, because it was a legislative act that was not reasonable and necessary to achieve NIFA's purported goal of fiscal soundness, violated the Contracts Clause of the United States Constitution. The district court (Seybert, *J.*) granted summary judgment for the defendants, holding that NIFA's implementation of the wage freeze was administrative, as opposed to legislative, and therefore did not implicate the Contracts Clause. We assume without deciding that NIFA's imposition of the wage freeze was legislative in nature. We, however, conclude that the wage freeze was a reasonable and necessary means to achieve NIFA's asserted end of ensuring the continued fiscal health of the County. For that reason, we hold that it did not violate the Contracts Clause, and we therefore AFFIRM the judgment of the district court.

Judge Park concurs in a separate opinion.

————————————————

HOWARD WIEN, Koehler & Isaacs LLP, New York, NY, *in support of Plaintiffs-Appellants Brian Sullivan and Nassau County Sheriff's Correction Officers Benevolent Association*

SHIRA A. SCHEINDLIN, (Alan M. Klinger, Stroock & Stroock & Lavan LLP; Steven E. Losquardo, PC, Rocky Point, NY, *on the brief*), Stroock & Stroock & Lavan LLP, New York, NY, *in support of Plaintiffs-Appellants James Carver, Gary Learned, and Thomas R. Willdigg.*

AARON E. KAPLAN (Daren J. Rylewicz, Leslie C. Perrin, Civil Service Employees Association, Inc., Albany, NY, *on the brief*), Civil Service Employees Association, Albany, NY, *in support of Plaintiffs-Appellants Jerry Laricchiuta, Danny Donohue, and Civil Service Employees Association, Inc.*

CHRISTOPHER GUNTHER, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *in support of Defendants-Appellees Nassau County Interim Finance Authority, Ronald A. Stack, George J. Marlin, Leonard D. Steinman, Thomas W. Stokes, Robert A. Wild, and Christopher P. Wright*

MARC S. WENGER (Jared A. Kasschau, Nassau County Attorney, Mineola, NY; Ana C. Shields, Ashley Zangara, Jackson Lewis P.C., *on the brief*), Jackson Lewis P.C., Melville, NY, *in support of Defendants-Appellees Edward Mangano and George Maragos.*

——————————————

3

GUIDO CALABRESI, *Circuit Judge*:

Plaintiffs, various unions and union leaders, represent much of the workforce of Nassau County in the state of New York. They brought this suit alleging that in 2011, the defendants—several County leaders as well as the Nassau County Interim Finance Authority ("NIFA") and its members—froze wages for County employees in violation of the Contracts Clause of the United States Constitution. The parties filed cross-motions for summary judgment, and the district court granted summary judgment for the defendants. It concluded that NIFA's implementation of a wage freeze was administrative in nature. Because the Contracts Clause applies only to legislative acts, the district court held that the wage freeze did not violate, indeed did not even implicate, the Contracts Clause.

We assume *arguendo* that the wage freeze was a legislative act that implicated the Contracts Clause. We nevertheless affirm the district court's grant of summary judgment because, even if the wage freeze was legislative, the defendants have met their burden of showing that it was a reasonable and necessary means of accomplishing a legitimate public purpose: remedying the County's fiscal problems.

## BACKGROUND

### A. The Nassau County Interim Finance Authority

Around the turn of the millennium, Nassau County was in the throes of a fiscal emergency. To rescue it, the New York Legislature passed the Nassau County Interim Finance Authority Act. N.Y. Pub. Auth. Law § 3650 *et al*. ("NIFA Act"). That act provided Nassau County with $100 million of direct funding and

4

created NIFA, a "corporate governmental agency and instrumentality of the state constituting a public benefit corporation" that would oversee the County's finances. NIFA Act § 3652. Among the powers given NIFA by that act was the power to impose a "control period" when NIFA determined that, "assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles," there exists "a substantial likelihood and imminence of" an operating funds deficit in the County's budget of one percent or more. *Id.* § 3669(1).

Under the NIFA Act, once NIFA declares a control period it gains significant oversight authority of the County's finances. This includes the ability to approve or disapprove any proposed "contract or other obligation" or "long-term and short-term borrowing by the [C]ounty." *Id.* §§ 3669(2)(d)(iii), (2)(e).

Most relevant here, however, when a control period is in place, NIFA is given the ability to freeze County employees' wages. Thus, when a control period has been declared, NIFA may make a finding "that a wage freeze is essential to the adoption or maintenance of a county budget" and enact a resolution declaring that a "fiscal crisis" exists in the County. *Id.* § 3669(3)(a). NIFA may then suspend all wage increases of County employees for one year. It may do so even though doing this negates the wage increases called for in those employees' previously negotiated contracts. *Id.* NIFA may, in its discretion, end the wage freeze at any time if it finds that the fiscal crisis has been alleviated or for any other valid reason. *Id.* § 3669(3)(c).

### B. The County's Agreements with The Plaintiffs

Each of the plaintiffs-appellants represents a County employee union that had an agreement affected by NIFA's decision to freeze wages. Plaintiffs Brian Sullivan, James Carver, Gary Learned, and Thomas Willdigg are the presidents of four law-enforcement unions: the Nassau County Sheriff's Correction Officers Benevolent Association, the Nassau County Police Benevolent Association, the Superior Officers Association of Nassau County, and the Nassau County Police Department Detectives' Association, Inc., respectively. Plaintiffs Jerry Laricchiuta and Danny Donohue are presidents of affected branches of the Civil Service Employees Association.

Each union had a collectively bargained agreement that was settled after the passage of the NIFA Act in 2000, but before NIFA implemented a wage freeze in 2011. All these agreements were the result of arbitration proceedings, as the unions and the County were unable to reach agreement through their own negotiations. Among other concessions and benefits, each of these agreements granted union members a wage increase during every year that they were in effect.

### C. Nassau County's Financial State

In 2010, the County's finances were in an unhealthy state. The County had been counting millions of dollars of borrowing as revenue, thereby making a potential liability appear to be a boon. Meanwhile, the County had limited ability to reduce its expenses because much of its budget was tied to either state or federal mandates. In 2007, for example, the County's Office of Management and Budget estimated that "approximately 70%" of the County's budget was "beyond its

6

control." No. 18-1606, Joint App'x 122. At the same time, about half of the County's expenditures were labor costs—including the salary and benefits of the plaintiffs here. Nevertheless, the County's bond rating was "fine." No. 18-1587, Joint App'x 887. It was not approaching bankruptcy, and it had a sufficient flow of cash to meet its obligations. There were also signs, such as increasing sales-tax revenue and decreasing unemployment, that the County's financial state was on the upswing.

Despite its financial woes, Nassau County was one of the wealthiest counties in New York, and indeed the nation, with a median annual household income approaching $100,000. But the County also had the highest median property taxes in the nation. In part this was because of the value of homes in the County, but it was also in part due to the tax rate the County imposed on those homes. Given this backdrop, many County residents were opposed to the imposition of additional taxes. And so, when Defendant Edward Mangano ran for County Executive on an "anti-property tax platform," No. 18-1587, Joint App'x 157, he won.

Mangano's first act in office was to sign the repeal of a home energy tax which had been projected to produce tens of millions of dollars in revenue in future years. An act to repeal that tax had been passed on a bipartisan basis in the County Legislature and was sent to him immediately after the election. Mangano also chose not to include in the County's budget for 2010 a previously planned 3.9% property tax increase. This tax increase had been projected to raise approximately $32 million each year in 2011, 2012, and 2013.

### *D. The 2011 Wage Freeze and Its Aftermath*

Shortly after Mangano took office, the NIFA Chairman, Defendant Ronald Stack, inquired as to how the County intended to make up the lost revenue from these foregone taxes. The County's proposed budget for 2011 sought to answer that question, but NIFA found that numerous items in that budget—amounting to approximately $244.4 million—were too uncertain to be relied on in determining whether the County's budget would be balanced.

The predicted budget imbalance was not, however, all the County's doing. NIFA had recently reversed course on allowing several accounting measures that the County had used in past budgets to help achieve balance. Specifically, NIFA forced the County to conform its 2011 budget to Generally Accepted Accounting Principles ("GAAP") and no longer allowed the County to borrow to pay property tax judgments, known as "tax certs," which the County owed to its residents from overcharging them on their real property tax assessments.

Despite continued discussions between the County and NIFA, the County ultimately went forward with a 2011 budget that NIFA believed was unbalanced. Shortly after the County passed this budget, Moody's downgraded the County's credit rating, deeming approximately $158 million of projected revenue to be at risk.

On January 26, 2011, based on its conclusion that there was a likelihood and imminence of a major operating funds deficit—defined by the NIFA Act as a deficit of greater than one percent—in the County's 2011 budget, NIFA declared a control period. As stated earlier, the implementation of a control period gave NIFA

significantly greater oversight powers. Among those additional powers was the ability to implement a wage freeze if NIFA concluded that there was a fiscal crisis and "a wage freeze [was] essential to the adoption or maintenance of a county budget …." NIFA Act § 3669(3)(a).

On March 24, 2011, NIFA passed two resolutions: the first, finding that a wage freeze was essential to the County's budget; the second, implementing such a wage freeze. NIFA gave numerous reasons for its decision. In addition to its own analysis of the County's financial state, NIFA relied on County Executive Mangano's explicit request for a wage freeze, the numerous other labor cuts, such as layoffs and furloughs, that the County had budgeted, and the County's own attempt to implement a similar wage freeze in the previous year.

After NIFA imposed the wage freeze, both NIFA and the County took numerous additional steps to improve the County's fiscal health. NIFA commissioned an outside consultant, Grant Thornton, to study County operational efficiencies and potential sources of revenue. That study identified between $251 and $319 million in possible savings for the County from a variety of initiatives and methods. While the County was generally favorable to some of these proposals, Nassau County Police Benevolent Association President (and plaintiff) James Carver called others "draconian" and potentially in violation of previously agreed to contracts.

The County took steps to lay off hundreds of workers during 2011 and has, in the years since 2010, eliminated more than 1,000 positions. Moreover, in October 2012, NIFA refinanced several hundred million dollars of debt, saving the County

approximately $34.8 million. Significantly, had NIFA refinanced this debt when the County originally requested it (before the wage freeze) the County would have saved notably less.

### E. Procedural History

The unions brought suit in the federal district court for the Eastern District of New York in 2011, shortly after the wage freeze went into effect. They argued that NIFA did not have the power to freeze wages under state law, and that the wage freeze violated the Contracts Clause of the United States Constitution. The district court ruled in their favor on state law grounds, holding that NIFA lacked the power to freeze wages after 2008. Accordingly, it did not reach the constitutional, Contracts Clause claim. *See Carver v. NIFA*, 923 F. Supp. 2d 423, 429 (E.D.N.Y. 2013).

We, however, held that the state-law issue that the district court had decided was a novel one that should have first been decided by the state courts. And so, we vacated and remanded the district court's decision. *See Carver v. NIFA*, 730 F.3d 150, 155–56 (2d Cir. 2013).

The unions then brought suit in state court, while the district court stayed the federal constitutional issue. The state courts reached the opposite conclusion of the district court and held that NIFA had the power to impose a wage freeze in the relevant year. *See Carver v. NIFA*, 38 N.Y.S.3d 197 (App. Div. 2d Dep't), *leave to appeal denied*, 69 N.E.3d 1022 (2016) (Table).

After losing in state court, the unions returned to the district court to litigate their constitutional, Contracts Clause, claim. The parties filed cross motions for

summary judgment, and the district court ruled in the defendants' favor. It held that NIFA's decision to impose a wage freeze was administrative and not legislative in nature, and so did not implicate the Contracts Clause. The unions moved to reconsider, and those motions were denied. Each union timely appealed, and we consolidated the three appeals by joint motion of the parties.[1]

## STANDARD OF REVIEW

We review the district court's evaluation of cross-motions for summary judgment *de novo*, "examining each motion 'on its own merits.'" *Vugo, Inc. v. City of New York*, 931 F.3d 42, 48 (2d Cir. 2019) (quoting *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011)). "Summary judgment is proper only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## DISCUSSION

### A. *Legislative, Administrative, and Judicial Acts*

The Contracts Clause of the United States Constitution states that "[n]o State shall … pass any … Law impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 1. A prerequisite to any violation of that Clause is that the challenged action be a "[l]aw" or, as the Supreme Court has explained, that it be legislative in

---

[1] The Sullivan plaintiffs filed an amended notice of appeal additionally appealing the denial of their motion for reconsideration. They, however, make no arguments specific to their reconsideration motion, and so we do not discuss it further.

nature. *See New Orleans Water-Works Co. v. Louisiana Sugar-Refining Co.*, 125 U.S. 18, 30–32 (1888).

In most Contracts Clause cases, whether the challenged action is legislative in nature is obvious and so does not bear mentioning. A State passes a statute that allegedly impairs a plaintiff's contract, and the plaintiff attacks that statute directly. *See, e.g., Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006).

But in other cases, whether an action is legislative is not so clear. As here, there is a statute underlying an action challenged by a plaintiff, but the action taken could itself be labeled as judicial or administrative rather than legislative. This triumvirate of possibilities—legislative, judicial, or administrative—is further complicated by the Supreme Court's long and consistently held view that whether actions are legislative "depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative in its character and effect.'" *I.N.S. v. Chadha*, 462 U.S. 919, 952 (1983) (quoting S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897)). *See also New Orleans Water-Works Co.*, 125 U.S. at 30–31 ("[I]t is not strictly and literally true that a law of a state, in order to come within the constitutional prohibition, must be either in the form of a statute enacted by the legislature in the ordinary course of legislation, or in the form of a constitution …."); *Williams v. Bruffy*, 96 U.S. 176, 183 (1877) ("Any enactment, from whatever source originating, to which a State gives the force of law is a statute of the State, within the meaning of the clause cited ….").

What does it mean, then, for an action to be legislative? Part of the inquiry revolves around whether the action is forward or backward-looking. "Legislation

… looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (1908). By contrast, "[a] judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Id.* Similarly, an action has been deemed not legislative if it involves the application, as opposed to the creation, of a rule.

For example, Louisiana once passed legislation granting a company exclusive rights to provide water to the city of New Orleans, but in the same legislation allowed the New Orleans city council to "grant[] to any person or persons, contiguous to the river, the privilege of laying pipes to the river, exclusively for his own or their own use." *New Orleans Water-Works Co.*, 125 U.S. at 20. Acting pursuant to this legislation, the city council allowed the Louisiana Sugar-Refining Company to set up a water and sewage system for its own use only. *Id.* at 21. The New Orleans Water-Works Company sued, alleging that this grant impaired its contract for the exclusive provision of water to all within New Orleans. But the Supreme Court held the city council's decision was the mere application of the state's previously established rule because "[t]he legislature itself [] defined the class of persons to whom, and the object for which, the permission might be granted. All that was left to the city council was the duty of determining what persons came within the definition…." *Id.* at 32. The city council's decision was thus administrative, and not subject to the Contracts Clause's requirements. *Id.*

When combined with the well-established idea that contracts necessarily incorporate the law as it stands at the time of contract formation, *see 2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991), the Supreme Court's treatment in *New Orleans Water-Works Co.* would seem to create a bright line: actions taken to implement a statute enacted by a legislature prior to the creation of a contract do not implicate the Contracts Clause. *See also Ogden v. Saunders*, 25 U.S. 213, 295 (1827) (explaining that the Contracts Clause's concern is contracts entered into prior to the taking of the challenged legislative action). But that potentially simple rule is complicated by two additional and commingled factors: the Supreme Court's holding that the exercise of some powers, no matter who exercises them, is necessarily legislative; and the advent of oversight agencies like NIFA, with authority to act under broad delegations of state power. Such powers may be too broad to be viewed as simply applications of a previously established rule.

This first factor is most easily seen in the example of a municipality. It has been settled law since the nineteenth century that an action exercising a state's powers to tax, to exercise its police authority, or to engage in other inherently legislative activities remains legislative regardless of whether a state delegates that action to a municipality or to some other entity. *See St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 148 (1901) ("It is no longer open to question that 'a by-law or ordinance of a municipal corporation may be such an exercise of legislative power delegated by the legislature to the corporation as a political subdivision of the state, having all the force of law … that it may properly be considered as a law, within the meaning of the [Contracts Clause].'" (quoting *New Orleans Water-Works*

*Co.*, 125 U.S. at 31)). That is why, when a municipality, or some other subdivision of a state, passes an ordinance that requires the exercise of the taxing or police powers to be effective, that ordinance is a "law" within the meaning of the Contracts Clause. *See, e.g., United States v. City of New Orleans*, 98 U.S. 381, 392–93 (1878) (discussing the power to tax). And it is not, by itself, determinative that the state delegated that power to a municipality or other entity in a statute enacted before the parties entered into the relevant contract.

The second factor directly touches the case before us. For in NIFA we deal with a paradigmatic example of the recent phenomenon of state-created oversight or emergency management authorities that operate under broad mandates. According to one commentator, at least nineteen states have passed these types of laws, which give emergency powers to an independent oversight authority like NIFA. *See* Comment, Rodney W. Harrell, *The Contract Clause of the Constitution and the Need for "Pass Any … Law" Rehabilitation in the Age of Delegation*, 22 Geo. Mason L. Rev. 1317, 1327 & n.78 (2015). Because these authorities are designed to take action in potentially dire situations, their statutory authority is usually expansive. A Michigan emergency manager statute, for example, gave that authority numerous powers, including the ability to "adopt or amend ordinances" or "to reject, modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement … [as] a legitimate exercise of the state's sovereign powers … if the emergency manager and the state treasurer determine that [certain] conditions are satisfied." *Welch v. Brown*, 551 F. App'x 804, 809 (6th Cir. 2014) (quoting Mich. Comp. Laws § 141.1519(1)(k)). Not surprisingly, the Sixth Circuit held that actions taken by an emergency manager under this statute were

15

legislative "because [the emergency manager statute] explicitly contemplates that the Emergency Manager's orders will carry the force of the state's sovereign powers." *Id.* at 809–10.

The NIFA Act does not grant NIFA powers nearly as expansive as Michigan's emergency manager statute, which essentially allowed the emergency manager to act in place of a town's mayor and city council. *See id.* But it does have similarities. Most importantly, both acts allow the oversight authority not only to breach a previously made employment contract to which a state entity is a party, but to use the state's powers to *invalidate* portions of those contracts, thereby negating any state law breach of contract remedy. And the federal Circuit Courts, as well as the Supreme Court, have consistently viewed this distinction—between breach and the removal of any remedy for a breach—as a line delineating whether a Contracts Clause claim might lie. *See, e.g., E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page Cty., Ill.,* 613 F.2d 675, 679–80 (7th Cir. 1980) (citing *Hays v. Port of Seattle,* 251 U.S. 233, 237 (1920) and *St. Paul Gaslight Co.,* 181 U.S. at 142).

It is plain that either the NIFA Act itself or NIFA's decision, under that Act, to impose a wage freeze implicates the Contracts Clause.[2] But which of the two is it? The NIFA Act authorized the impairment, but it did not actually impair any of the plaintiffs' contracts. Indeed, the NIFA Act predates each of the contracts at issue. Conversely, NIFA's decision to impose a wage freeze did impair earlier

---

[2] Of course, the fact that an action implicates the Contracts Clause does not—as we will explain soon enough—mean that it violates the Clause.

made contracts, because that decision both breached the plaintiffs' contracts and negated the plaintiffs' state-law remedy. But that action could be characterized as no more than the administration of the NIFA Act, thereby making it a non-legislative action that does not implicate the Clause. Alternately, it can be deemed an action taken under a grant of delegated legislative authority that is so broad that the action amounts to something like the passage of an ordinance by a municipality.

Because we can uphold NIFA's actions on other grounds, we need not, and hence, do not, decide on which side of the line NIFA's wage freeze decision falls. And, assuming *arguendo* that NIFA's decision implicates the Contracts Clause, we hold that summary judgment for the defendants-appellees was nevertheless proper, concluding that NIFA's decision was reasonable and necessary to achieve the legitimate public goal of rescuing the County's finances.

### B. *Substantial Impairment and Legitimate Public Purpose*

Assuming then that the wage freeze implicates the Contracts Clause, we now examine whether it violates that Clause. The Contracts Clause, as applied to governmental contracts, incorporates two differing imperatives. *Buffalo Teachers*, 464 F.3d at 367-68. The first is that the government, like private parties, is bound by its contracts and may not use its governmental powers to impair these contracts materially. The second is that the state may not contract away its power to govern in the public interest. A government contract that induces a sword company to produce plowshares cannot be abrogated by an otherwise valid statute simply because the government later discovers that a knife company can make cheaper

plowshares. On the other hand, a clause in that contract that says the state will forego war cannot keep the government from declaring war when the national security demands it.

To determine which of these is occurring, we must examine: "(1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary." *Buffalo Teachers*, 464 F.3d at 368 (citing *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–13 (1983)).

If the impairment is insubstantial, or the law is a reasonable and necessary means to remedy a legitimate public purpose, the Contracts Clause is not violated. What constitutes substantial impairment and public purpose were addressed directly in *Buffalo Teachers*, which presented a situation nearly identical to ours, and which, therefore, both binds and guides our analysis.

*a)  Substantial Impairment*

The substantiality of an impairment depends upon "the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 993 (2d Cir. 1997). And the reasonableness of expectations depends, in part, on whether legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry. *See id*. (citing *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38 (1940)).

In *Buffalo Teachers*, we said that "[c]ontract provisions that set forth the levels at which union employees are to be compensated are the most important elements of a labor contract. The promise to pay a sum certain constitutes not only the primary inducement for employees to enter into a labor contract, but also the central provision upon which it can be said they reasonably rely." 464 F.3d at 368. In other words, wage levels are a crucial component of labor contracts and are likely to create reasonable expectations.

The defendants argue, however, that in the instant case the County raised the possibility of a NIFA-mandated wage freeze during the arbitration proceedings that led to some of the plaintiffs' contracts. And hence, they assert, the wages settled on could not have created reasonable expectations. This argument is unavailing.

As an initial matter, we note that the possibility of a wage freeze was raised only during the police unions' contract negotiations, and so could not affect the Contracts Clause analysis for the CSEA plaintiffs. But even as to the police unions, the context of the statements belies any possibility that those statements made a wage freeze something the police unions should be held reasonably to expect.

Putting aside contract law's general distaste for extrinsic evidence, *see CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018), the County's statements suggesting that a wage freeze might occur were made during an adversarial proceeding before arbitrators. And there is nothing in the record to suggest that either the unions or the arbitrators adjudicating that proceeding adopted the County's view that a NIFA-imposed wage freeze was imminent or likely. Indeed, the arbitrators

almost certainly rejected the County's view. They awarded the unions wage increases that extended over the life of the contracts, and New York law requires that, in collective bargaining proceedings, arbitrators consider "the financial ability of the public employer to pay." N.Y. Civ. Serv. L. § 209(4)(c)(v)(b).

Moreover, the arbitrators' apparent rejection of the County's argument that a wage freeze was forthcoming seems eminently reasonable. The County had no power to impose a wage freeze itself. That power belonged exclusively to NIFA. And NIFA, at the time of the arbitration, had given no indication that a wage freeze was forthcoming. Moreover, it had never previously imposed a wage freeze, even in 2000 when the NIFA Act was passed and the County's finances were at their nadir.

We decline to say that any statements discussed during contract negotiations, despite not being incorporated into the contract, suffice to upset the otherwise reasonable expectations of the contracting parties. And so we adhere to our holding in *Buffalo Teachers* that a substantial impairment exists when a law changes "the levels at which union employees are to be compensated." *Buffalo Teachers*, 464 F.3d at 368.

### b) Public Purpose

Our holding in *Buffalo Teachers*, however, also makes clear that NIFA acted with a legitimate public purpose in the case before us when it chose to freeze the plaintiffs' wages. NIFA acted in order to alleviate what it viewed as a fiscal crisis in the County, and this is a legitimate public purpose with respect to the Contracts Clause. *Buffalo Teachers*, 464 F.3d at 368.

The plaintiffs argue that this was a "paper crisis" caused by NIFA's requirement that the County use GAAP for its 2011 budget. But the plaintiffs' have presented no evidence to undermine NIFA's findings that the County's 2011 proposed budget would likely lead to a $50 million deficit even without the switch to GAAP, and that the 2011 budget already included other draconian measures to solve the County's fiscal problems—like layoffs and unpaid furloughs. It is thus clear that NIFA did not impose the wage freeze "for the mere advantage of particular individuals." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934). Instead, NIFA froze the plaintiffs' wages "for the protection of a basic interest of society." *Id.*

The key to all this—we repeat—is to determine whether the state in breaching a contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies its impairing the plaintiffs' contracts in the public interest. It was with this in mind that in *Buffalo Teachers* we developed and applied a "less deference" standard. It is to that standard, and what it entails, that we now turn.

### C. Reasonableness and Necessity

Under the *Buffalo Teachers* "less deference" standard, we look first to whether the contract impaired is public or private. If—like the one before us—it is public, we ask whether there is "some indicia" that the state impaired the contract out of its own self-interest. *Buffalo Teachers*, 464 F.3d at 369–70. If so, then "less deference" scrutiny applies and "it must be shown that the state did not (1) 'consider impairing the ... contracts on par with other policy alternatives' or (2)

'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.'" *Id.* at 370 (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 30–31 (1977)). These factors amount to a requirement that the state acted both reasonably and out of necessity.

In other words, when the state impairs a public contract the presumption that a passed law is valid and done in the public interest does not immediately apply. Instead, we must examine the record for indicia of self-serving, privately motivated, action. And if sufficient evidence of those indicia exists, "less deference" is given, and the reasonableness and necessity of the government's actions must be shown.

This raises the question of who bears each of these burdens. We conclude that the burden of putting forth sufficient evidence to show that "less deference" scrutiny should apply lies with the plaintiffs, and that the plaintiffs have met that burden here. We, however, take no position on whether the plaintiffs or the government bears the burden of proving the reasonableness and necessity of the government's contract-impairing actions. This question was not squarely addressed in *Buffalo Teachers* and has split the other Courts of Appeal that have addressed the issue. *Compare United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño,* 633 F.3d 37, 43 (1st Cir. 2011) (placing this burden on the plaintiffs), *with Toledo Area AFL–CIO Council v. Pizza,* 154 F.3d 307, 323 (6th Cir. 1998) (placing this burden on the government defendants), *and State of Nev. Emps. Ass'n, Inc. v. Keating,* 903 F.2d 1223, 1228 (9th Cir. 1990) (same). We hold today that

even assuming *arguendo* that the burden is on the government, the defendants here have successfully borne it.

### a) What Plaintiffs Must Show for "Less Deference" Scrutiny to Apply

As we stated in *Buffalo Teachers*, determining whether to apply "less deference" scrutiny requires "focusing on whether the contract-impairing law is self-serving." 464 F.3d at 370. If there are *some indicia* that the contract impairment is merely "the government [reneging] on its obligations—altering the contract for its own benefit," then "less deference" scrutiny is needed. Guido Calabresi, *Retroactivity: Paramount Powers & Contractual Changes,* 71 Yale L. J. 1191, 1200–01 (1962).

Thus, "less deference" scrutiny applies only when the plaintiff has put forward some evidence tending to show that the government has engaged in reneging instead of "genuinely acting for the public good." *Buffalo Teachers*, 464 F.3d at 370 (citing *Blaisdell,* 290 U.S. at 445); *cf. United States v. Armstrong*, 517 U.S. 456, 468–70 (1996) (requiring "some evidence tending to show the existence" of discriminatory selective prosecution before a defendant is entitled to receive discovery on that defense).

Reneging is, at its core, about impairments imposed to benefit the state financially, or as a matter of political expediency. Therefore, evidence showing indicia of reneging may take many forms. One of these could be evidence that the contractual impairment was chosen when other politically unpopular alternatives were available. *See, e.g., Assoc. of Surrogates & Supreme Court Reporters within City of New York v. State of New York*, 940 F.2d 766, 773 (2d Cir. 1991).

Similarly, a plaintiff might show that the state may have reneged through evidence that the law took aim at a narrow class of individuals when its purported goals could be served equally by spreading the necessary sacrifice throughout a broader, and perhaps more politically powerful, base. *See*, *e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978) (noting that the change to pension plans in that case "was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees"); *Condell v. Bress*, 983 F.2d 415, 419 (2d Cir. 1993) ("We agree that the number of people involved [in the contractual impairment] is one factor to be considered on the issue of 'reasonable and necessary' …."); *Surrogates*, 940 F.2d at 773 ("[B]y placing the costs of improvements to the court system on the few shoulders of judiciary employees instead of the many shoulders of the citizens of the state, they ruffle only a few feathers and fight the 'exploding drug crisis' without raising taxes or cutting other governmental programs.").

Finally, indicia of reneging may be shown through evidence that the contractual impairment is a response to a well-known, long-standing, problem, as opposed to a change in circumstances. *See*, *e.g.*, *U.S. Trust Co.*, 431 U.S. at 31–32 (holding a contractual impairment unreasonable in part because for "over a half century" "the need for mass transportation in the New York metropolitan area was not a new development, and the likelihood that publicly owned commuter railroads would produce substantial deficits was well known").

Applying this standard to the case before us, we conclude that the plaintiff unions have put forward sufficient evidence of potential reneging to require the

application of "less deference" scrutiny to NIFA's wage-freeze decision. The wage freeze potentially benefited the state of New York financially, as New York had previously shown itself willing to bail out the County in other contexts. *See* No. 18-1587, Joint App'x 52. Indeed, one of the purposes of NIFA is to provide oversight that will avoid another bailout. *Id.* at 52–53. And there is some evidence that the County pushed for the wage freeze because alternative savings proposals were unpopular in the news media. *See* No. 18-1634, Joint App'x 1514, 1606–07 (describing an abandoned Memorandum of Agreement between CSEA and the County). While this latter action was taken by the County, and not NIFA, NIFA's wage-freeze decision was predicated in part on County Executive Mangano's request that it impose a wage freeze.

The plaintiffs having met their burden of showing some evidence that this law may be self-serving, we apply "less deference" scrutiny to the wage freeze decision before us. And we must, therefore, examine whether the requirements of reasonableness and necessity have been met.

*b) The Wage Freeze Was Reasonable and Necessary*

Applying "less deferential" scrutiny to NIFA's wage-freeze decision, we conclude that the wage freeze was a reasonable and necessary response to the County's fiscal crisis. While the plaintiffs maintain that the County's fiscal crisis existed only on paper—caused by the NIFA-mandated switch to GAAP—they have provided no response to the fact that the County faced a GAAP-calculated 2011 budget deficit of $176 million, and even under non-GAAP accounting measures the County faced a $49 million deficit. Significantly, the NIFA Act states

25

that NIFA "shall impose a control period" when it determines that the County would incur "a major operating funds deficit of one percent," or $27 million in 2011. NIFA Act § 3669(1). Moreover, the NIFA Act states that this one percent deficit is to be calculated "in accordance with generally accepted accounting principles," *i.e.*, GAAP. *Id.* We therefore find that NIFA was responding to a real, as opposed to paper, fiscal crisis.

     *i. Reasonableness*

Given that NIFA was responding to a genuine crisis, numerous factors underscore the reasonableness of the 2011 wage freeze. First, while the plaintiffs often conflate the two defendant government entities involved—the County and NIFA—it is important to recognize that NIFA is an independent body, subject to some control, not by the County, but by the state of New York. And it is NIFA, not the County, which imposed the wage freeze.

Significantly, many of the alternative proposals that the plaintiffs suggest—reinstating previously planned or repealed taxes, raising fines and fees, etc.—were solely under the County's purview and outside of NIFA's control. And the plaintiffs-appellants do not argue, let alone proffer evidence, that, for purposes of the wage freeze decision, we should view NIFA and the County as one and the same, or that the County otherwise undermined NIFA's independence. We therefore deem it appropriate to evaluate the relevant alternatives from the perspective of what NIFA had the power to accomplish, as opposed to what the County might perhaps have been able to do.

From this perspective, the wage freeze was clearly reasonable. It was prospective and "d[id] not affect past salary due for labor already rendered." *Buffalo Teachers*, 464 F.3d at 372. It lasted for one year only, and so was of limited duration. *See Blaisdell*, 290 U.S. at 447 (noting that the temporary nature of an impairment suggested its reasonableness).

It also came on the heels of, and simultaneously with, the imposition by the County of drastic cuts to the County's labor force. Before the wage freeze went into effect, the County had reduced employee headcount by 400 through an early retirement program. And in its 2011 budget, the County proposed to cut an additional 213 positions through layoffs and department closures, as well as to require 13 days of unpaid furlough for County employees.

These were, of course, County actions. But NIFA recognized that without a temporary wage freeze, the County would have to take further steps along these lines, and those steps represented "a more drastic alternative" than the temporary wage freeze. No. 18-1606, Joint App'x 286–87. After reviewing the County's proposed 2011 budget, NIFA reasonably concluded that the broader public interest would be served by obtaining savings from a wage freeze instead of through what appeared to be the County's only other remaining options: draconic additional cuts to the County's labor force or unpaid furloughs.

While the plaintiff police unions had protection from layoffs, much of the County's workforce did not. Any layoffs were therefore almost certain to be concentrated among non-police personnel. As NIFA recognized, the County's broader workforce was thus likely to prefer preserving jobs and avoiding unpaid

27

leave to receiving an incremental wage increase. And the County's residents would also benefit because layoffs and furloughs would lead to a decrease in services, while a wage freeze would not. Under the circumstances, NIFA's decision was eminently reasonable.

### ii. Necessity

Many of these reasons also support a finding that the wage freeze was necessary. NIFA had no other discernible options to improve the County's fiscal state. As we previously noted, NIFA had no power to force the County to raise taxes. And there is no evidence to suggest that the state—NIFA's superior—was in a position to raise taxes either. To the extent the state's financial health is mentioned in the record, the evidence suggests that it too was in a financial crunch. (Indeed, the governor in 2011 planned to freeze *state employees'* wages!) Additionally, "even if the state could have raised its taxes, [there was no reason to believe] any monies so raised would flow to [the County]." *Buffalo Teachers*, 464 F.3d at 372.

While the plaintiffs-appellants argue that NIFA should have commissioned a report auditing the County's finances prior to imposing the wage freeze, we do not see why NIFA should have delayed taking action until this was done. And, in fact, shortly after imposing the wage freeze, NIFA commissioned just such a report (the Grant Thornton Report), though it had no power to force the County to take any of the report's suggestions.

The plaintiffs' argument that NIFA should have refinanced its debt at lower interest rates prior to the wage freeze is similarly unavailing. Waiting to refinance actually allowed NIFA to achieve greater savings.

Time has, moreover, proven NIFA's belief about the necessity of the wage freeze to have been correct. Even after the Grant Thornton Report, the 2011 wage freeze, increasing fines and fees, and a 1,000-headcount reduction in County employees since 2010, the County was unable to put forward a balanced budget. The County's multi-year financial plan, set to begin in fiscal year 2012, did not purport to achieve balance until 2015.

*       *       *

In view of these facts, we readily conclude that NIFA's actions in imposing the 2011 wage freeze were both reasonable and necessary and comfortably meet the standard of "less deference" scrutiny. *See Buffalo Teachers*, 464 F.3d at 372. In reaching this conclusion, we emphasize that "[w]hether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned." *Blaisdell*, 290 U.S. at 447–48. Our job is simply to determine whether the wage freeze was imposed in order to renege on a contract (to get out of a bad deal) or as a governmental action intended to serve the public good, as the government saw it.

## CONCLUSION

We **AFFIRM** the District Court's April 27, 2018 judgment granting summary judgment to the defendants-appellees as well as the District Court's August 8, 2018 decision denying reconsideration of that summary judgment decision.

MICHAEL H. PARK, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in the judgment and join in Sections B(b) and C(b) of the Court's opinion, which are all that is necessary to decide this case. I write separately to note that most of the discussion in the other sections is dicta. That is because (1) we assume without deciding that NIFA's action was legislative rather than administrative, Maj. Op. at 17, and (2) it does not matter what level of deference should be given to Defendants because the wage freeze was clearly reasonable and necessary, *id.* at 30. At bottom, our holding today is a straightforward application of *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362 (2d Cir. 2006), which recognized that no analysis of "levels of deference" is needed when a wage freeze is reasonable and necessary. *See id.* at 370 ("For the purposes of this appeal, we need not resolve what level of deference to apply. Instead, we will assume that the lower level of deference applies because . . . the wage freeze is reasonable and necessary even under the less deferential standard."). The majority's musings, then, about the hallmarks of legislative versus administrative action, Maj. Op. at 12–17; the types of evidence that might show government self-interest, *id.* at 23–26; and the meaning of "less deference," *id.* at 22–23, are all dicta and unnecessary. Thus, I respectfully decline to join those sections of the majority's opinion.