20-3530-cv
Conn. State Police Union v. Rovella

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2021

(Argued: October 29, 2021          Decided: June 2, 2022)

Docket No. 20-3530-cv

_____

CONNECTICUT STATE POLICE UNION,

*Plaintiff-Appellant*,

v.

JAMES ROVELLA, COMMISSIONER OF DEPARTMENT OF EMERGENCY
SERVICES & PUBLIC PROTECTION,

*Defendant-Appellee*.

_____

Before:

LYNCH, LOHIER, and BIANCO, *Circuit Judges*.

We consider whether the United States District Court for the District of Connecticut (Haight, J.) abused its discretion by denying the Connecticut State Police Union's motion for a preliminary injunction on the ground that the union was unlikely to succeed on the merits of its Contracts Clause claim. Because we conclude that the law the union sought to enjoin was reasonable and necessary to achieve a legitimate public purpose, we identify no error in the District Court's legal or factual conclusions. AFFIRMED.

PROLOY K. DAS (Kristen L. Zaehringer, Kevin W. Munn, *on the brief*), Murtha Cullina LLP, Hartford, CT, *for Plaintiff-Appellant* Connecticut State Police Union.

MICHAEL K. SKOLD, Assistant Attorney General, *for* Clare Kindall, Solicitor General, William Tong, Attorney General, State of Connecticut, Hartford, CT, *for Defendant-Appellee* James Rovella, Commissioner of Department of Emergency Services & Public Protection.

LOHIER, *Circuit Judge*:

The Contracts Clause of the United States Constitution forbids States from "pass[ing] any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. We have long recognized that this prohibition is not absolute. States may impair contracts — including, as relevant here, ones to which they themselves are a party — so long as the law in question is reasonable and necessary to achieve a legitimate public purpose. In assessing the reasonableness and necessity of a law that impairs a public contract, we ask whether the State, in passing the law, was acting self-servingly or governing in the public interest. If the former, we accord the State less deference. If the latter, we properly defer to its determination that a law is reasonable and necessary.

The contract at issue in this case is a collective bargaining agreement currently in force between the Connecticut State Police Union ("CSPU") and the

State of Connecticut. That agreement includes a provision that exempts certain police records from disclosure under the Connecticut Freedom of Information Act ("FOIA"). About a year after the Connecticut state legislature ratified the agreement, however, Connecticut found itself in the throes of a racial justice movement that began when George Floyd was killed by a white police officer in Minneapolis. In response to Floyd's murder and the nationwide protests that followed, Connecticut lawmakers passed a law that, among other things, nullified FOIA exemptions such as the one in the agreement here.

The CSPU brought suit against James Rovella, the Commissioner of Connecticut's Department of Emergency Services and Public Protection (the "Commissioner"), alleging that the FOIA-related portions of the state law violated the Contracts Clause and moving for a preliminary injunction. The District Court (Haight, J.) denied the motion primarily on the ground that the CSPU was unlikely to succeed on the merits of its claim since the law was reasonable and necessary to promote transparency and accountability for law enforcement. Because we conclude that the law served a legitimate public purpose and that the legislature, in passing it, acted not self-servingly but in the public interest, we agree and **AFFIRM**.

# BACKGROUND

On July 1, 2018, the CSPU — the union representing Connecticut state troopers, sergeants, and master sergeants — entered into a collective bargaining agreement with the State of Connecticut, effective until June 30, 2022.  Article 9, Section 2 of that agreement, the subject of this appeal, covers the conditions under which employee records may be released under Connecticut's FOIA.  It provides:

> When an employee, after notification to him/her that a freedom of information request has been made concerning his/her file, objects to the release of that information on the basis of reasonable belief that the release would constitute an invasion of his/her privacy, the employee shall petition the Freedom of Information Commission for a stay on the release of said information, and the Department shall support the employee's petition and not release the information until the FOIC has made a final determination on the issue of whether said release would constitute an invasion of privacy.  An employee's [official personnel folder] and internal affairs investigations with only a disposition of "Exonerated, Unfounded or Not Sustained" shall not be subject to the Connecticut Freedom of Information Act.

App'x 119 (emphases omitted).

The FOIA exemption reflected in the final sentence did not exist in the agreement that was in place between the parties from 2015 to 2018 but was added "in response to concerns regarding an increase in false anonymous complaints filed against Troopers."  Conn. State Police Union v. Rovella, 494 F.

4

Supp. 3d 210, 216 (D. Conn. 2020). Although Connecticut's FOIA generally provides that "all records maintained or kept on file by any public agency" are "public records" that anybody may inspect or copy, Conn. Gen. Stat. § 1–210(a) (2021), the non-disclosure provision of the collective bargaining agreement was permissible under Section 5–278(e) of the Connecticut General Statutes, which at the time provided that the terms of a collective bargaining agreement trumped "any general statute or special act," id. § 5–278(e).

Connecticut's legislature ratified the agreement in May 2019. A year later, on May 25, 2020, Minneapolis police officers arrested George Floyd, a 46-year-old Black man, after a convenience store clerk called 9-1-1 and reported him for allegedly buying cigarettes with a counterfeit $20 bill. What happened next is now well known. When Floyd resisted sitting in the back seat of the police squad car, saying he was claustrophobic, three officers pinned him face-down on the ground. A white officer knelt on Floyd's neck for nearly ten minutes while Floyd repeatedly said he could not breathe. Floyd was pronounced dead that night, and video of his encounter with the police went viral, sparking major protests against police brutality and racism in Minneapolis and around the country.

Amid a national outcry, on July 17, 2020, Connecticut Governor Ned Lamont called a special session of the state legislature to "enact legislation to promote greater transparency and accountability for law enforcement." A Proclamation from His Excellency the Governor 3 (July 17, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200717-Call-of-July-2020-Special-Session.pdf. By official proclamation, Governor Lamont declared that the "killing of George Floyd has revealed once again the injustice and cruelty that Black people and other people of color suffer at the hands of law enforcement, and has thereby awoken the public's demand for reforms to our law enforcement agencies and progress toward a just and equitable society." Id. at 2. Invoking "what Dr. Martin Luther King, Jr. called 'the fierce urgency of now,'" the Governor added that "much more work remain[ed] to be done" to "promot[e] police accountability and transparency." Id.

By the end of the month, the legislature had passed, and the Governor had signed, Public Act 20–1: An Act Concerning Police Accountability ("the Act"). Section 8 of the Act took aim at FOIA exemptions under Connecticut law such as the one at issue here. It repealed Section 5–278 and provided that "the provisions of [Connecticut's] Freedom of Information Act shall prevail" in the event of a

6

conflict with a provision of a collective bargaining agreement "pertaining to the disclosure of disciplinary matters or alleged misconduct [that] would prevent the disclosure of documents required to be disclosed under [FOIA]." Public Act 20-1 § 8. Under Section 9, meanwhile:

> No collective bargaining agreement or arbitration award entered into before, on or after the effective date of this section, by the state and any collective bargaining unit of the Division of State Police within the Department of Emergency Services and Public Protection may prohibit the disclosure of any disciplinary action based on a violation of the code of ethics contained in the personnel file of a sworn member of said division.

Id. § 9. In a training bulletin for state troopers, the Department of Emergency Services and Public Protection, a statewide agency, described the Act as "[n]ullif[ying] collective bargaining language . . . previously negotiated[] regarding the disclosure of disciplinary action, including Internal Affairs investigations." App'x 185.

On August 11, 2020, the CSPU filed this lawsuit against the Commissioner to enjoin Sections 8 and 9 of the Act for violating the Contracts Clause. The CSPU initially sought a temporary restraining order, which the District Court denied after concluding that it "ha[d] not demonstrated the requisite combination of likelihood of success on the merits on its Contract Clause claim [or] irreparable harm to Police Union members between today and the

7

preliminary injunction hearing if a TRO is not issued at this time." Conn. State Police Union v. Rovella, No. 3:20-cv-01147 (CSH), 2020 WL 7419648, at *2 (D. Conn. Aug. 20, 2020). The District Court then held an expedited hearing on the CSPU's motion for a preliminary injunction, which it also denied. "On the present record," the District Court held, the CSPU had not shown that it was "likely to establish that the challenged provisions in the Act were not reasonable or necessary to achieve the state's legitimate public purpose" and therefore failed to establish that it was "likely to succeed on its Contracts Clause claim." Rovella, 494 F. Supp. 3d at 230.

In rejecting the CSPU's request for injunctive relief, the District Court applied our test in Buffalo Teachers Federation v. Tobe, 464 F.3d 362 (2d Cir. 2006), for determining whether a State has violated the Contracts Clause. The District Court asked (1) whether the contractual impairment was substantial and, if so, (2) whether the law served "a legitimate public purpose such as remedying a general social or economic problem" and, if so, (3) whether "the means chosen to accomplish this purpose [were] reasonable and necessary." Buffalo Tchrs., 464 F.3d at 368; see also Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411–13 (1983).

8

As to the first question, the District Court "assume[d] without deciding that the Act's disclosure provisions disrupted the CSPU's reasonable expectations under the 2018–2022 Collective Bargaining Agreement and thus constituted substantial impairment of that contract." Rovella, 494 F. Supp. 3d at 224. Turning to whether the law served a legitimate public purpose, the District Court reasoned that it was "evident from the public record [that] the Act was adopted to promote greater transparency and accountability for law enforcement in response to a Minneapolis police officer's killing of George Floyd on May 25, 2020, which . . . awoke the public's demand for reforms to our law enforcement agencies." Id. at 224–25 (quotation marks omitted). The District Court also found that the Commissioner had established that Sections 8 and 9 of the Act served a legitimate public purpose because the Act's disclosure provisions "align[ed] with FOIA's strong legislative policy in favor of the open conduct of government and free public access to government records." Id. at 225 (quotation marks omitted).

The District Court spent the most time on the third question: whether the Act was reasonable and necessary to achieve its public purpose. To start, the District Court noted that where a State is a party to the impaired contract, the

amount of deference a court must accord a legislature's stated aims depends on whether there is "'some indicia' that the state impaired the contract out of its own self-interest." Id. (quoting Sullivan v. Nassau Cnty. Fin. Auth., 959 F.3d 54, 65 (2d Cir. 2020)). If so, the District Court explained, then courts must apply "less deference" scrutiny and ask whether the State (1) considered impairing the contract "on par with other policy alternatives," (2) "impose[d] a drastic impairment when an evident and more moderate course would [have] serve[d] its purpose equally well," or (3) "act[ed] unreasonably in light of the surrounding circumstances." Id. at 225–26 (quotation marks omitted). The District Court held that the CSPU had not met its burden of showing that "less deference" scrutiny ought to apply because the legislature was motivated to pass the Act "by the public interest, not self-interest," id. at 227, and because there was no evidence that the Act conferred "any financial benefit on the State," id. at 228. Even if "less deference" scrutiny were appropriate, the District Court submitted, the Act would withstand such review because the CSPU had failed to demonstrate that Sections 8 and 9 were unreasonable under the circumstances, and because it had "offer[ed] no evidence that Connecticut considered impairing the 2018–2022 Collective Bargaining Agreement on par with other policy

alternatives, or that a more moderate course would [have] serve[d] the State's purpose of promoting transparency equally well." Id. at 229.

Having determined that the CSPU was unlikely to succeed on the merits of its claim, the District Court believed that it did not need to address the other prongs of the preliminary injunction test. Still, it concluded that enjoining Sections 8 and 9 would not serve the public interest, and that the balance of equities did not tip in the CSPU's favor, since preventing the law from taking effect would "circumvent the state's salutary efforts to enhance transparency and promote accountability in law enforcement." Id. at 230.

This appeal followed.[1]

**DISCUSSION**

**I.**

We review the denial of a preliminary injunction for abuse of discretion, examining a district court's legal conclusions de novo and factual conclusions for clear error. Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision, 16 F.4th 67, 78 (2d Cir.

---

[1] After filing its appeal, the CSPU sought an injunction pending appeal in the District Court and in this one, but both motions were denied. See D. Ct. Dkt. Nos. 31, 35; ECF Nos. 29, 84.

2021).  A party seeking a preliminary injunction in this Circuit must establish "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  Id. (quotation marks omitted).  Where, as here, a preliminary injunction "would stay government action taken in the public interest pursuant to a statutory . . . scheme[,] . . . the less rigorous burden of proof standard envisioned by the phrase 'fair ground for litigation' does not apply, and instead the party seeking injunctive relief must satisfy the more rigorous prong of 'likelihood of success.'"  Bronx Household of Faith v. Bd. of Educ. of New York, 331 F.3d 342, 349 (2d Cir. 2003).  This higher standard reflects the deference courts must accord to laws "developed through reasoned democratic processes." Id.

## II.

Under the Contracts Clause, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. 1, § 10, cl. 1.  Chief Justice Marshall famously described the Clause as establishing the "great

principle[] that contracts should be inviolable." Melendez v. City of New York, 16 F.4th 992, 1017 (2d Cir. 2021) (quoting Sturges v. Crowninshield, 17 U.S. 122, 206 (1819)). But despite its "unambiguously absolute" language, the Contracts Clause "is not . . . the Draconian provision that its words might seem to imply." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978); see id. ("[L]iteralism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection." (quotation marks omitted)); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435 (1934) ("The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while, — a government which retains adequate authority to secure the peace and good order of society."). This is especially so for legislation that impairs a public contract — that is, a contract to which the State itself is a party. See Melendez, 16 F.4th at 1020–21 (recognizing that the Supreme Court has "signaled hesitancy to construe rights conferred by the states in public charters as overriding a state's police powers" since "[n]o legislature can bargain away the public health or the public morals" (quotation marks omitted)).

13

As applied to public contracts, we have therefore recognized that the Contracts Clause "incorporates two differing imperatives." Sullivan, 959 F.3d at 63. On the one hand, "the government, like private parties, is bound by its contracts and may not use its governmental powers to impair these contracts materially." Id. Equally, however, "the state may not contract away its power to govern in the public interest." Id. In Sullivan, we illustrated these principles using the following example:

> A government contract that induces a sword company to produce plowshares cannot be abrogated by an otherwise valid statute simply because the government later discovers that a knife company can make cheaper plowshares. On the other hand, a clause in a contract that says the state will forego war cannot keep the government from declaring war when the national security demands it.

Id. at 63–64.

As the District Court did in this case, to determine whether a law violates the Contracts Clause, we ask (1) whether the contractual impairment is substantial, (2) whether the law serves "a legitimate public purpose such as remedying a general social or economic problem," and (3) whether the means chosen to accomplish that purpose are reasonable and necessary. Id. at 64 (quoting Buffalo Tchrs., 464 F.3d at 368). If the contractual impairment is not

14

substantial, or if the law is a reasonable and necessary means of serving a legitimate public purpose, then there is no violation. See Sullivan, 959 F.3d at 64.

We address each question in turn.

**III.**

Because it is not dispositive to our analysis, we assume without deciding that the contractual impairment at issue here was substantial. We therefore turn to whether the law served a legitimate public purpose and, if so, whether it was a reasonable and necessary means of achieving that end.

**A.**

In general, a legitimate public purpose is one that is "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." Buffalo Tchrs., 464 F.3d at 368 (quotation marks omitted); see also Energy Rsrvs., 459 U.S. at 411–12. In several instances, we have recognized that a legislature acts in the public interest when it addresses a fiscal emergency. See Buffalo Tchrs., 464 F.3d at 369; Sullivan, 959 F.3d at 65; Donohue v. Cuomo, 980 F.3d 53, 83 (2d Cir. 2020). But that is not the only context in which we have held that a law serves a legitimate public purpose. We have said, for example, that a legislature acts in the public interest when it expands the class of

15

debtors who would "be able to keep their homes despite declaring bankruptcy," CFCU Cmty. Credit Union v. Hayward, 552 F.3d 253, 268 (2d Cir. 2009); when it promotes "safety, efficiency and equity in designing and implementing a waste management system," Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 54 (2d Cir. 1998); and when it regulates private carting companies to eradicate "the vestiges of criminal control accompanied by bid-rigging . . . and predatory pricing," Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 994 (2d Cir. 1997). Although far from an exhaustive list, what these laws have in common is that they were passed in the service of "a broad societal goal, not the pursuit of the interests of a narrow class." Id.

Here, the District Court concluded that the Act served two legitimate public purposes: ensuring the transparency and accountability of law enforcement and promoting "FOIA's strong legislative policy in favor of the open conduct of government and free public access to government records." Rovella, 494 F. Supp. 3d at 225 (quotation marks omitted). We agree.

We turn first to the broader policy of furthering openness in government and public access to government records. The longstanding existence of Connecticut's FOIA — and the similar federal FOIA and equivalent statutes in

16

other States — demonstrates that this policy is a widely accepted object of public concern. That the original text of Connecticut's FOIA did not contain the exception for police disciplinary records created by the 2018 collective bargaining agreement indicates that the legislature, in creating a broad mandate for open government in the public interest, adopted the very public policy with respect to police records that the CSPU characterizes as self-interested or favoring narrow special interests. It was, to the contrary, the collective bargaining agreement that introduced a special contractual departure from the original policy to satisfy a powerful group of public employees. The restoration of the prior FOIA regime exemplifies the point that the legislature cannot permanently bargain away its responsibility to govern in the public interest.[2]

Moreover, addressing police misconduct is "a broad societal goal." Sanitation & Recycling, 107 F.3d at 994. The strong public reaction to Floyd's murder made clear that the legislature was responding to an important and pressing social ill. The name of the law — "An Act Concerning Police

---

[2] We express no view on the substantive merits of the legislature's balancing of public transparency against individual privacy in either the original (and restored) FOIA or the 2018 collective bargaining agreement. That judgment is for the legislature. Our point is simply that the legislature is responsible for enacting what it regards as an appropriate balance, and that the choice it made in 2020 was an exercise of that responsibility.

Accountability" — makes that purpose plain, as do the circumstances surrounding its passage. As we have noted, in convening the special session in which the law was passed, Governor Lamont invoked Floyd's murder to urge lawmakers to "enact legislation to promote greater transparency and accountability for law enforcement." See Rovella, 494 F. Supp. 3d at 216 (quotation marks omitted). The representative who later moved for passage of the bill described it in similar terms. The Act, he said, would give the police "an enhanced opportunity to work collaboratively with their unions, with us as a legislature[,] and with their citizens to address the issues of police accountability and transparency." Conn. House of Reps., Tr. of Proceedings 341 (July 23, 2020), https://www.cga.ct.gov/2020/trn/H/pdf/2020HTR00723-R01-TRN.pdf.

Urging a contrary conclusion, the CSPU argues that the legislature was motivated not by the public interest but by a desire to undermine the collective bargaining agreement. In support, it points to evidence that lawmakers were aware of the potential conflict between the Act and the agreement and went ahead with it anyway. At a public hearing, for example, the CSPU's executive director urged the legislature to "honor the language in our contract," emphasizing that the police had "seen a significant increase in anonymous, false

18

complaints involving serious allegations of misconduct . . . [that] should not be disclosed to the public." Appellant's Br. 20 (quotation marks omitted). The CSPU also points to a report from the General Assembly's Office of Legislative Research that conceded that applying the bill's FOIA provisions to "existing agreements" might "conflict with the U.S. Constitution's contracts clause." Id. at 20–21 (quotation marks omitted). But the unremarkable fact that lawmakers knew of this potential conflict and were aware of its implications under the Contracts Clause does not mean that they had no legitimate purpose for enacting the law.

In addition, the CSPU maintains that the District Court "improperly conflated the Governor's general goals for the Special Session during which [the Act] was enacted with the specific legislative purpose behind Sections 8 and 9." Id. at 24. But by making it easier for the public to access records pertaining to alleged police misconduct, Sections 8 and 9 fit comfortably within Governor Lamont's goal of promoting greater transparency and accountability for law enforcement.

19

**B.**

Having decided that the Act served a legitimate public purpose, we consider next whether the law was reasonable and necessary. In conducting this inquiry, we distinguish between laws that impair private contracts and laws that impair public ones. See Sullivan, 959 F.3d at 65. Where the State impairs a contract to which it itself was a party, we may not immediately assume that the law is valid and passed in the public interest. See id. at 66. Instead, we first ask if there is any indication that the State impaired the contract out of its own self-interest — that is, whether the State abrogated the contract to benefit itself financially or because doing so was politically expedient. Id. At heart, this inquiry turns on "whether the state in breaching a contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies" impairing a contract "in the public interest." Id. at 65. If the State appears to have acted self-servingly, then we accord the legislature "less deference," which means that we uphold the law unless the State "(1) consider[ed] impairing the . . . contracts on par with other policy alternatives or (2) impose[d] a drastic impairment when an evident and more moderate course would serve its purpose

equally well, [or] (3) act[ed] unreasonably in light of the surrounding circumstances."[3] Id. (quotation marks omitted).

As the plaintiff in this case, the CSPU bears the burden of demonstrating that "less deference" should apply. See id. at 66. To do so, the union may show that Connecticut acted self-servingly if, for example, it chose to impair the contract at issue even though other, less politically popular alternatives were available; if it targeted "a narrow class of individuals when its purported goals could be served equally by spreading the necessary sacrifice throughout a broader, and perhaps more politically powerful, base"; or if the legislation in question was a "response to a well-known, long-standing, problem, as opposed to a change in circumstances." Id. at 66–67.

The CSPU offers two pieces of evidence to support its view that the Connecticut legislature acted self-servingly. Both are unavailing.

---

[3] The CSPU, citing Melendez, argues that we must apply strict scrutiny in evaluating a law that impairs a public contract. See Appellant's Supplemental Br. 6. But Melendez said no such thing. To the contrary, in Melendez we strove to cabin our analysis to laws that impair private contracts rather than public ones. See Melendez, 16 F.4th at 1021 (declining to discuss a line of cases relating to public contracts since the law at issue in the case "act[ed] on private, not public, contracts"); id. at 1027–28 (declining to "enter into . . . debates" regarding the appropriate standard of review for impairments of public contracts). Melendez therefore does not (and could not, without an in banc proceeding) alter the framework set forth in Sullivan and Buffalo Teachers to evaluate a law that impairs a public contract.

First, it points to a June 2020 order of the Connecticut Office of Labor Relations, which directed the Department of Emergency Services and Public Protection to stop seeking the consent of state troopers to release investigations that resulted in findings of "exonerated," "unfounded," or "not sustained" since the collective bargaining agreement did not "allow release in those circumstances." App'x 199–200. Although the CSPU suggests that the state legislature passed Sections 8 and 9 to secure an end-run around this order, it points to no evidence that the legislature was even aware of it, let alone motivated by it. And even if the ruling spurred the legislature to act, that would not suffice to show that Connecticut acted in its own self-interest, especially since subjecting police records to the State's FOIA neither benefitted the State financially nor targeted a narrow class of politically powerless individuals. See Sullivan, 959 F.3d at 66 ("Reneging is, at its core, about impairments imposed to benefit the state financially, or as a matter of political expediency.").

Second, the CSPU argues that there was no change in circumstance that could have justified impairing the collective bargaining agreement. But Floyd's murder, and the nationwide protests it prompted, presented precisely the sort of changed circumstance to which the legislature might reasonably have wished to

respond. The CSPU counters that Floyd's murder could not have justified the FOIA provisions of the Act because disclosing investigations that result in a disposition of "exonerated," "unfounded," or "not sustained" would simply disseminate "false allegations of misconduct" rather than truly address the absence of police accountability. Appellant's Br. 29 (emphasis omitted). We disagree. As the Commissioner points out, the fact that a complaint results in such a disposition does not necessarily mean that the allegations were false. It could also mean that there was insufficient or disputed evidence to substantiate the complaint, or that the complained-of action occurred but was proper under the circumstances. See Appellee's Br. 30. At a more general level, the public may often have a strong interest in learning about a complaint even when it does not justify disciplinary action. "Accountability follows publicity." Igneri v. Moore, 898 F.2d 870, 877 (2d Cir. 1990). "In the classic formulation of Justice Brandeis: 'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'" Id. (quoting L. Brandeis, Other People's Money and How the Bankers Use It 62 (National Home Library Foundation ed. 1933)). As the Commissioner observes, "there is a 'public interest in the fairness of police

23

investigations' themselves, 'even for investigative reports that exonerate police officers from the charges that have been brought against them.'"  Appellee's Br. 30–31 (quoting Dep't of Pub. Safety, Div. of State Police v. Freedom of Info. Comm'n, 242 Conn. 79, 88 (1997)).

What level of deference should courts apply where, as here, the State acts not self-servingly but in the public interest?  To date we have provided only a few hints as to what the answer to that question might be.  See Sullivan, 959 F.3d at 65–67 (applying "less deference" scrutiny to the wage freeze in question because the plaintiffs had put forth sufficient evidence that the law might "be self-serving" and explaining that, when the state impairs a public contract, "less deference" applies where sufficient indicia of self-serving intent trumps a "presumption that a passed law is valid and done in the public interest"); Buffalo Tchrs., 464 F.3d at 370 (distinguishing between cases where the state legislature shirks "its obligations as a matter of political expediency" and "genuinely act[s] for the public good," but assuming without deciding that "less deference" should apply because the wage freeze at issue would be "reasonable and necessary even under [that] standard" (quotation marks omitted)).  We now hold that in the absence of "self-serving, privately motivated, action" on behalf of the

24

State, courts may presume that the "passed law is valid and done in the public interest."[4] Sullivan, 959 F.3d at 66. If there is no indication "that the state impaired the contract out of its own self-interest," id. at 65, in other words, we properly defer to the State's assessment of the reasonableness and necessity of the law in question. Our deference is not blind, however; it can be overcome by compelling evidence from plaintiffs that the State's actions were either unreasonable or unnecessary.

Because there is no indication that the Connecticut legislature acted self-servingly in passing the Act at issue in this case, we defer to its determination that the law was reasonable and necessary to address issues relating to police misconduct or accountability. The CSPU has not provided any compelling

---

[4] Citing U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1 (1977), the CSPU suggests that we may not defer to a State's assessment regarding a law that impairs any public contract. We disagree. In U.S. Trust, which involved the impairment of a public contract, the Supreme Court held that "complete deference to a legislative assessment of reasonableness and necessity [was] not appropriate because the State's self-interest [was] at stake." 431 U.S. at 25–26. There the self-interest of the State was clear, as the challenged law reduced the State's "own financial obligations." Id. at 25; see also id. at 26 ("If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."); Energy Rsrvs., 459 U.S. at 412 n.14 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations." (emphasis added)). As we explained in Sullivan, however, not every impairment of a public contract involves self-interest on the part of the State, and a less deferential review applies only when the government "has engaged in reneging instead of genuinely acting for the public good." 959 F.3d at 66 (quotation marks omitted).

evidence that contradicts the determination. To be sure, the union argues that the law was unreasonable because there were "no changed or unforeseen circumstances" that could have justified impairing the collective bargaining agreement. Appellant's Br. 28. But, as we have noted, making it easier for the public to access police records was a reasonable response to the "genuine crisis" in public confidence facing American cities and States in the weeks and months following the nationwide protests that Floyd's murder spurred. See Sullivan, 959 F.3d at 68. As the record shows, Connecticut was not immune to that crisis or the ensuing protests. See, e.g., Rovella, 494 F. Supp. 3d at 216–17. In addition, the law represents only a temporary conflict with the collective bargaining agreement, which is set to expire — along with its FOIA exemptions — in June 2022. Cf. Sullivan, 959 F.3d at 68 (wage freeze was "clearly reasonable" because "[i]t lasted for one year only, and so was of limited duration"); Blaisdell, 290 U.S. at 447 (suggesting that an impairment was reasonable in part because "[t]he legislation [was] temporary in operation"). And it is notable that the state legislature maintained the FOIA privileges and exemptions that exist under Connecticut law: Even after passage of the Act, for example, the public may not use Connecticut's FOIA to access personnel files "the disclosure of which would

constitute an invasion of personal privacy," Conn. Gen. Stat. § 1–210(b)(2) (2021), and the Department of Emergency Services and Public Protection must independently assess the risk of such an invasion for each request it receives, id. § 1–214(b).

As for necessity, the CSPU argues that the legislature could have waited to pass the FOIA provisions of the Act until after the expiration of the collective bargaining agreement in June 2022. See Appellant's Br. 30; Oral Arg. Tr. at 7:9–7:12. Again, we are not persuaded by this particular argument about timing, for in July 2020, when the Connecticut legislature met in special session, the protests in Connecticut and elsewhere made clear that it was finally time to address issues of police accountability. See Rovella, 494 F. Supp. 3d at 216–17 (Lamont proclamation convening special assembly). Under these circumstances and the resulting sense of urgency, waiting for two more years to make police records more accessible was not a viable alternative option.[5]

---

[5] At oral argument, counsel for the CSPU suggested that the legislature could also have considered subjecting only a subset of documents to FOIA — permitting the disclosure of records relating to investigations that result in a disposition of "exonerated," for example, while retaining the exemption in the collective bargaining agreement for investigations that result in a disposition of "unfounded" or "not sustained." See Oral Arg. Tr. at 10:14–10:19. Because the CSPU failed to adequately present that argument in its briefing, "we consider [the] argument[] abandoned" and need not address it. State

We therefore conclude that the District Court properly determined that the CSPU was not likely to succeed on the merits of its Contracts Clause claim.

**IV.**

Because the District Court did not err in concluding that the CSPU could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the CSPU demonstrated irreparable harm or whether an injunction would be in the public interest.  See, e.g., Tinnerello, 141 F.3d at 56; see also Butts v. Aultman, 953 F.3d 353, 361 (5th Cir. 2020); Apotext, Inc. v. F.D.A., 449 F.3d 1249, 1253–54 (D.C. Cir. 2006).  The District Court's conclusion on the merits was thus sufficient to justify its decision to deny the CSPU's motion for a preliminary injunction.

**CONCLUSION**

We have considered the CSPU's remaining arguments and conclude that they are without sufficient merit to warrant reversal.  For the foregoing reasons, we AFFIRM the judgment of the District Court.

---

St. Bank & Tr. Co. v. Inversiones Errazuiriz Limitada, 374 F.3d 158, 172 (2d Cir. 2004). In any event, for the reasons already noted, that approach was unlikely to address the crisis in public confidence about police conduct and accountability that confronted the legislature.  Nor, as counsel acknowledged, would the approach have deterred the CSPU from challenging even the disclosure of a limited subset of documents as unconstitutional.