(Slip Opinion)

# Application of the Randolph-Sheppard Act to the United States Mint

*Although the Randolph-Sheppard Act generally requires federal agencies to give a preference to blind vendors when authorizing vending facilities on property they control, Congress in 31 U.S.C. § 5136 exempted the relevant operations of the United States Mint from that requirement. The regulations of the Department of the Treasury implementing the Act, which predate 31 U.S.C. § 5136, also do not require the Mint to follow the Act's preference requirements.*

September 9, 2024

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF EDUCATION

The Randolph-Sheppard Act establishes a priority rule that requires federal agencies that operate or control federal property to give a preference to blind vendors when "authorizing the operation of vending facilities" on that property. 20 U.S.C. § 107(b). The United States Mint ("Mint"), a bureau of the Department of the Treasury ("Treasury"), did not follow these requirements at a Denver facility. The Mint claims that Congress exempted it from the Randolph-Sheppard Act in 31 U.S.C. § 5136, which states that "provisions of law governing procurement or public contracts shall not be applicable" whenever the Mint procures "goods or services necessary for carrying out Mint programs and operations." The Department of Education ("Education") is responsible for implementing the Randolph-Sheppard Act, 20 U.S.C. § 107a(a), and you have requested our advice on whether the Mint is correct.[1]

For the reasons that follow, we conclude that it is. The priority rule is a "provision[] of law governing procurement or public contracts," and the relevant activities are "necessary for carrying out Mint programs and

---

[1] We received the views of Education and of the Mint, on behalf of Treasury, on this issue. *See* Memorandum for Gillian E. Metzger, Deputy Assistant Attorney General, Office of Legal Counsel, from Lisa Brown, General Counsel, Department of Education, *Re: Request for OLC Guidance on the Applicability of the Randolph-Sheppard Act to the U.S. Mint* (Nov. 20, 2023); Memorandum for Gillian E. Metzger, Deputy Assistant Attorney General, Office of Legal Counsel, from John F. Schorn, Chief Counsel, United States Mint, *Re: Response to Department of Education Request for OLC Guidance on the Applicability of the Randolph-Sheppard Act to the United States Mint* (Feb. 5, 2024) ("Mint Response").

operations" within the meaning of section 5136. We thus believe section 5136 exempts the relevant Mint activities from the priority rule. We also conclude that Treasury's regulations implementing the priority rule, which predate section 5136, do not require the Mint to follow that rule.

## I.

### A.

Enacted in 1936 to "provid[e] blind persons with remunerative employment" and "enlarg[e] the economic opportunities of the blind," the Randolph-Sheppard Act encourages blind vendors to operate "vending facilities" on federal property. 20 U.S.C. § 107(a). The Act "authorize[s]" blind vendors to operate such "vending facilities," requires that at least one "vending facilit[y]" be established at every federal property if "feasible," and gives licensed blind persons "priority" in operating those facilities. *Id.* § 107(a)–(b). The Randolph-Sheppard Act, by its terms, applies to all federal property, with one exception: An agency may limit the placement or operation of a vending facility if that placement or operation "would adversely affect the interests of the United States." *Id.* § 107(b).

To implement the Act, Congress established a cooperative federal-state system. Primary responsibility for administration falls to the Rehabilitation Services Administration at Education, which designates a state agency to license blind vendors and oversees the Randolph-Sheppard program in each state. *Id.* §§ 107a(a)(1), 107b. When a vendor wishes to open a vending facility on federal property, the state licensing agency and relevant federal agency must reach an agreement—known as a "permit"—setting forth the terms and conditions for operating and maintaining the facility. 34 C.F.R. § 395.16; *see* Vending Facility Program for the Blind on Federal and Other Property, 42 Fed. Reg. 15,802, 15,804 (Mar. 23, 1977) (describing the permit system). If a state licensing agency believes a federal agency is failing to comply with the Act, it may file a complaint with Education. 20 U.S.C. § 107d-1(b).

### B.

For most of its history, the Mint relied on annual appropriations to finance its principal mission of producing coins. In 1996, however, Con-

gress removed Mint funding from the annual appropriations process and established the United States Mint Public Enterprise Fund ("Fund"). *See* Treasury, Postal Service, and General Government Appropriations Act, 1996, Pub. L. No. 104-52, § 522, 109 Stat. 468, 494–95 (1995) (codified at 31 U.S.C. § 5136). Congress recognized that "the variability of annual appropriations ha[d] placed a burden o[n] production operations," S. Rep. No. 104-121, at 25 (1995), and that "there should be more application of basic business practices to the [Mint's] operations," H.R. Rep. No. 104-183, at 23 (1995).

To achieve this end, Congress required "all receipts from Mint operations and programs" to be deposited into the Fund and made the Fund "available without fiscal year limitations." 31 U.S.C. § 5136. Congress then authorized the Fund to pay "all expenses incurred . . . that the Secretary of the Treasury determines, in the Secretary's sole discretion, to be ordinary and reasonable incidents of Mint operations and programs." *Id.* Congress defined "Mint operations and programs" very broadly, specifying that this term:

> means (1) the activities concerning, and assets utilized in, the production, administration, distribution, marketing, purchase, sale, and management of coinage, numismatic items, the protection and safeguarding of Mint assets and those non-Mint assets in the custody of the Mint, and the Fund; and (2) includes capital, personnel salaries and compensation, functions relating to operations, marketing, distribution, promotion, advertising, official reception and representation, the acquisition or replacement of equipment, the renovation or modernization of facilities, and the construction or acquisition of new buildings.

*Id.* Finally, Congress directed that "provisions of law governing procurement or public contracts shall not be applicable to the procurement of goods or services necessary for carrying out Mint programs and operations." *Id.*

Section 5136 was not the first time that Congress had exempted aspects of the Mint's operations from procurement and contracting laws. When Congress directed the Mint to produce commemorative coins, it several times provided similar exemptions. *See, e.g.*, Bicentennial of the United States Capitol Commemorative Coin Act, Pub. L. No. 103-186, tit. IV,

§ 409(a), 107 Stat. 2245, 2254 (1993) ("[N]o provision of law governing procurement or public contracts shall be applicable to the procurement of goods and services necessary for carrying out the provisions of this title."); Statue of Liberty-Ellis Island Commemorative Coin Act, Pub. L. No. 99-61, tit. I, § 107, 99 Stat. 113, 114 (1985) (same). As the Director of the Mint explained to Congress, these exceptions were "useful" in allowing the Mint to move quickly because they eliminated "opportunities [for] disappointed bidders to challenge the low bid award and in turn delay implementation." *Design Pak, Inc. v. Sec'y of Treasury*, 801 F.2d 525, 526 n.1 (1st Cir. 1985) (per curiam) (quoting *Statue of Liberty-Ellis Island Commemorative Coin Act: J. Hearing Before the Subcomm. on Consumer Affs. & Coinage of the H. Comm. on Banking, Fin. & Urb. Affs. & the S. Comm. on Banking, Hous. & Urb. Affs.*, 99th Cong. 39 (1985)); *see also* U.S. Mint, Annual Report of the Director of the Mint: Fiscal Year 1986 at 22 (1986) (reporting that the Mint used the exemption to include "special provisions" in supplier contracts, "such as the use of back-up sources and liquidated damages provisions," in order to save money and improve reliability).

## C.

The question before us arises out of the Mint's contracts with private vendors to operate a gift shop and "micro market" at the Mint's Denver facility. The gift shop sells Mint coins and medals and an array of Mint-branded and Mint-related products—as well as non-numismatic items, such as merchandise related to Colorado and other souvenirs. Mint Response at 3. The micro market is an "automated convenience store" allowing employees to serve themselves "single serve candy, snacks, drinks, [and] food" and to pay for these items at a self-checkout kiosk. *See* Agreement Between Peak Refreshments, LLC and Denver Mint Employees' Ass'n at 1 (Feb. 15, 2024); Email for Gillian E. Metzger, Deputy Assistant Attorney General, Office of Legal Counsel, from John F. Schorn, Chief Counsel, United States Mint, *Re: Randolph-Sheppard Act and U.S. Mint Follow-Up Questions* (July 12, 2024, 9:04 PM). Education and the Mint agree—and our analysis assumes—that both the gift shop and the micro market are "vending facilities" under the Randolph-Sheppard Act.

Before contracting for the gift shop and micro market, the Mint did not provide notice or a procurement preference to blind vendors. The Colorado Department of Human Services, Business Enterprise Program—the Colorado agency responsible for licensing blind vendors under the Randolph-Sheppard Act—informed Education that it believes the Mint is not in compliance with the Act. In response, the Mint claimed that 31 U.S.C. § 5136 exempted it from the Randolph-Sheppard Act and its implementing regulations, Mint Response at 2, which prompted Education to ask for our views.

## II.

By its terms, the Randolph-Sheppard Act requires the Mint to give priority to blind persons in awarding permits for vending facilities. *See* 20 U.S.C. § 107(a). But that Act is not the only statute in play here. The question we face is whether Congress exempted the Mint's contested activities from the Act's priority rule by providing in 31 U.S.C. § 5136 that the Mint is not bound by (1) "provisions of law governing procurement or public contracts" as applied to (2) "the procurement of goods or services necessary for carrying out Mint programs and operations." For the reasons discussed below, we conclude that Congress did so.

## A.

The Randolph-Sheppard Act's priority rule is undoubtedly a "provision[] of law governing procurement or public contracts." Although section 5136 does not define "procurement," Congress has defined "procurement" for purposes of subtitle I of Title 41, which generally governs public contracts, as "all stages of the process of acquiring property or services." 41 U.S.C. § 111. A similar definition appears in the Federal Acquisition Regulation. *See* 48 C.F.R. § 2.101(a). Those definitions also accord with the ordinary meaning of "procurement." *See Procure*, American Heritage Dictionary 1445 (3d ed. 1992) (to "obtain or acquire"); *see also Procure*, 8 Oxford English Dictionary 1418 (1978) ("[t]o obtain by care or effort"); *Procure*, Webster's New International Dictionary 1974 (2d ed. 1958) ("to acquire; gain; get; obtain by any means"). Under those definitions, the Randolph-Sheppard Act's priority rule—which addresses the selection of vendors when the government acquires services "to oper-

ate vending facilities on federal properties," *Kentucky Educ. & Workforce Dev. Cabinet v. U.S. ex rel. Hagel*, 759 F.3d 588, 592 (6th Cir. 2014)—unambiguously governs procurement. *See NISH v. Rumsfeld*, 348 F.3d 1263, 1271 (10th Cir. 2003) (concluding that the priority rule concerns "procurement" within the meaning of Title 41); *NISH v. Cohen*, 247 F.3d 197, 204 (4th Cir. 2001) (same).

The priority rule also governs public contracts. A public contract is "a contract to which the State itself is a party." *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022); *see Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420, 611 (1837) (using the phrase "public contracts" to mean contracts to which "a state is a party" (quoting *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 70 (1805))); *Baltimore Teachers Union v. Mayor of Baltimore*, 6 F.3d 1012, 1019 & n.9 (4th Cir. 1993) ("Public contracts" are a "State's own contracts[.]" (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978))). Agreements to operate vending facilities on federal property invariably involve a governmental entity as a party. So when the Randolph-Sheppard Act requires the government to prioritize making agreements with particular parties on particular terms, it governs "public contracts."

## B.

### 1.

This leaves the question of when a "procurement of goods or services" is "necessary for carrying out Mint programs and operations," as section 5136 requires. As noted, "Mint operations and programs" means "activities concerning . . . distribution, marketing, [and] sale" of coins and the protection of Mint assets, as well as "functions relating to operations, marketing, distribution, promotion, [and] advertising," among other things. The phrase "related to" has a "broad" meaning, encompassing anything "having a connection with or reference to [an object], whether directly or indirectly." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (cleaned up). Hence, section 5136's definition of "Mint operations and programs" appears to encompass most if not all of the Mint's activities, which principally consist of the manufacture and distribution of "circulating, precious metal, and collectible coins, national

medals, and providing security over assets entrusted to [the Mint]," as well as supporting functions that are "related to" these activities. *See* U.S. Mint, 2023 Annual Report 42 (2024).

Determining when a procurement is "necessary" for carrying out such operations and programs is less clear-cut. Section 5136 does not define that term, and "necessary" is a "chameleon-like word whose meaning . . . may be influenced by its context." *Cellco P'ship v. FCC*, 357 F.3d 88, 96 (D.C. Cir. 2004); *see Ayestas v. Davis*, 584 U.S. 28, 44–45 (2018) (discussing different meanings of "necessary"); *Armour & Co. v. Wantock*, 323 U.S. 126, 129–30 (1944) (emphasizing that "necessary" "has always been recognized as a word to be harmonized with its context").

On the one hand, in many contexts, both courts and our Office have read the word "necessary" flexibly to mean "appropriate" and "helpful" to achieving a certain end. *Ayestas*, 584 U.S. at 44 (noting that "in ordinary speech," "necessary" often "refer[s] to something that is merely important or strongly desired"); *see M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819) ("necessary" "frequently imports no more than that one thing is convenient, or useful, or essential to another"); *FTC v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979). For example, the Supreme Court has read the phrase "ordinary and necessary expense" in tax law to require that an expense be merely "appropriate and helpful" for "the development of the [taxpayer's] business." *Comm'r v. Tellier*, 383 U.S. 687, 689 (1966) (quoting *Welch v. Helvering*, 290 U.S. 111, 113 (1933)). Similarly, in appropriations law, the "necessary expense" doctrine "permits an agency to expend funds . . . '[i]f the agency believes that [the] expenditure bears a logical relationship to the objectives of the general appropriation.'" *Authority of the Department of Defense to Use Appropriations for Travel by Service Members and Dependents to Obtain Abortions*, 46 Op. O.L.C. __, at *8 (Oct. 3, 2022) ("*Authority of the Department of Defense*") (quoting *Use of General Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 153–54, 156 (1997)); *see Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 144 S. Ct. 1474, 1486–87 (2024) (when a provision allows agency to draw amounts "necessary to carry out" its duties within a statutory cap, it gives the agency "discretion"). And we recently concluded, in assessing Treasury's cash-balance practices, that "the term 'necessary' gives Treasury reasonable flexibility in selecting means that are best suited to satisfy the

spending obligations that Congress has given it." *Treasury's Cash Balance and the August 1, 2021 Debt Limit*, 45 Op. O.L.C. __, at *17–18 (July 8, 2021) ("*Treasury's Cash Balance*").

On the other hand, "necessary" sometimes carries the stricter meaning of "essential," *Ayestas*, 584 U.S. at 44, or "absolutely needed" or "required," *In re Flyers Rts. Educ. Fund, Inc.*, 61 F.4th 166, 168 n.3 (D.C. Cir. 2023) (capitalization and quotation marks omitted). For example, the Americans with Disabilities Act permits operators of public accommodations to employ criteria that discriminate against persons with disabilities if such criteria are "necessary" for the services offered. 42 U.S.C. § 12182(b)(2)(A)(i). In that context, the Eleventh Circuit has read "necessary" to mean "essential" or something that "cannot be avoided," in line with the statutory policy of limiting exceptions to antidiscrimination protections. *Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245, 1254–55 (11th Cir. 2023) (quoting *Necessary*, Black's Law Dictionary (11th ed. 2019)); *see Women's Elevated Sober Living LLC v. City of Plano*, 86 F.4th 1108, 1112–13 (5th Cir. 2023) (concluding that the phrase "necessary to afford [a] person equal opportunity to use and enjoy a dwelling" in the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B), requires a showing that an accommodation is "indispensable or essential" to enjoyment).

Context makes clear that, in section 5136, Congress used "necessary" in the word's more flexible sense of appropriate and helpful. Congress created the Fund to make the Mint self-supporting and allow the Mint to apply private sector "basic business practices." H.R. Rep. No. 104-183, at 23; *see* S. Rep. No. 104-121, at 25–26 (concurring with House report). Consistent with this goal, Congress defined the object of "necessary" in section 5136, "Mint programs and operations," extremely broadly. This term includes not only a wide array of actions relating to coins and numismatic items, but also the Mint's administrative, managerial, and operational undertakings, as well as any "activities concerning" or "functions relating to" these expansive categories. *See* 31 U.S.C. § 5136. By defining "Mint programs and operations" in such sweeping terms, Congress indicated that it meant for the procurement exemption to cover the wide range of activities undertaken by the Mint—in other words, it meant for all of the Mint to function like a business, not just some subset of it.

These features of the statute are far more in keeping with a flexible understanding of "necessary" than with an indispensable or absolute necessity standard. *Cf. Authority of the Department of Defense* at *5–6 (inferring from Congress's inclusion of an extensive but nonexhaustive list of examples of "actual and necessary" expenses, as well as from the modifier "actual," that a provision used "necessary" in the looser sense). The Mint would hardly resemble a business if it had to follow federal procurement and public contracts law unless deviating were essential or absolutely necessary. More than that, such a standard would invite disputes and even litigation over whether departing from federal procurement and public contracts law was indeed necessary in a particular case— which would again thwart Congress's goal of allowing the Mint to behave in a business-like manner. Indeed, section 5136 built on commemorative coin statutes with identical exemptions, and, as noted above, the Mint informed Congress that it used those exemptions to achieve workaday efficiencies and avoid disputes. When Congress used the same language again in section 5136, it would not have understood that language to impose a narrow absolute-necessity standard that would invite challenge.

Yet further support for this more flexible understanding of "necessary" comes from the extensive discretion over Mint finances that section 5136 gives the Secretary. Section 5136 grants the Secretary "sole discretion" to determine which expenses count as "ordinary and reasonable incidents of Mint operations and programs" and to withdraw money from the Mint's revolving fund to pay for them. 31 U.S.C. § 5136. The Secretary may likewise determine when and in what amount to provide excess earnings from the Mint's revolving fund to the general fund of the Treasury. *Id.* When Congress uses the word "necessary" in a provision that otherwise grants broad discretion, Congress often uses that word in its more flexible sense. *See, e.g.*, *Rockefeller*, 591 F.2d at 188 (because "necessary" was used in "an enactment clearly intended to augment" the FTC's "broad" investigatory power, the word "should not be strictly or narrowly construed"); *Authority of the Department of Defense* at *12 (construing an appropriation using "necessary" "in light of the discretion accorded to agencies to determine whether expenditures further the agency's authorized purposes").

To be sure, Congress has elsewhere used additional contextual clues that can provide further confirmation that it has used "necessary" in this

more flexible sense. Pairing "necessary" with words like "reasonably" or "ordinary" can do so. *See, e.g.*, *Ayestas*, 584 U.S. at 44–45. So can expressly conferring discretion to determine what is necessary. *See, e.g.*, *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1979). But Congress need not exhaust its repertoire to speak clearly—and even without these additional clues, "necessary" often carries its more flexible meaning. *See, e.g.*, *Treasury's Cash Balance* at \*16–17; *Rockefeller*, 591 F.2d at 188; Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursement of 1976 Democratic Presidential Campaign Committee* at 3 (July 21, 1978). So too here. Applying the strict definition of "necessary" would frustrate Congress's intent for the Mint to operate in a business-like manner and significantly constrain the broad discretion over Mint expenses that section 5136 elsewhere expressly provides.

## 2.

Applying this more flexible understanding of "necessary," we conclude that the Mint could reasonably determine that the Denver Mint's gift shop and micro market are appropriate and helpful to its programs and operations and therefore exempt from provisions of law regulating government procurement and contracting, including the Randolph-Sheppard Act. The gift shop sells Mint coins and other Mint numismatic items, thereby supporting the Mint's coinage and numismatic programs and operations. *See* Mint Response at 3. According to Treasury, the gift shop's sale of non-numismatic items is necessary for its financial viability; such non-numismatic items thus also relate to the marketing of coinage and numismatic products. *See id.* (noting that "[t]o make the business model work, the vendor is contractually permitted to sell related products"). And the Mint could reasonably conclude that, by providing a means for Denver Mint employees to obtain food and beverages on site, the micro market will contribute to workplace productivity and employee morale, thereby benefitting all the programs and operations performed at the Denver Mint.

We recognize that, given the breadth of section 5136's exemption, our analysis means that in practice the Mint may be largely (and perhaps entirely) exempt from the Randolph-Sheppard Act and other government procurement and contracting laws. We thus do not reach this conclusion lightly. *Cf. Hawaii v. Dep't of Educ.*, 46 F.4th 1148, 1156 (9th Cir. 2022)

("[T]he statutory structure of the [Randolph-Sheppard Act] invites us to interpret it broadly in favor of increased opportunities for blind vendors."); *Texas Workforce Comm'n v. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (concluding that the Randolph-Sheppard Act should be read to further its purpose when such a reading is "reasonable and permissible"). But the express exemption Congress gave the Mint in section 5136, and in the commemorative coin statutes that presaged it, is both unusually clear and distinctively broad, such that we could identify similarly capacious language in only one other statute—the United States Postal Service's exemption from most "Federal law dealing with public or Federal contracts." 39 U.S.C. § 410(a). In that circumstance, however, Congress specifically reimposed the Randolph-Sheppard Act. *See id.* § 410(b)(3). That example therefore both reinforces our conclusion that an exemption for "public contracts" otherwise covers the Randolph-Sheppard Act and shows that, in the rare case when Congress enacts a procurement and contracting exemption, it knows how to exclude the Act—something it did not do here.

## III.

We have also considered whether Treasury's regulations subject the Mint to the Randolph-Sheppard Act's priority rule. In 1993, two years before Congress enacted section 5136, Treasury promulgated regulations to implement the Randolph-Sheppard Act requiring that blind vendors "be given priority in the location and operation of vending facilities" on property "owned, leased, or occupied by a bureau or office of the Department of the Treasury, of which the maintenance, operation, and protection is under the control of the Department of the Treasury." 31 C.F.R. §§ 11.2, 11.3(a). Treasury explained that these regulations "merely conform[] the Department's regulations to law and the regulations of the Secretary of Education" and determined that, as a result, notice and comment were not required. Operation of Vending Facilities by the Blind on Federal Property Under the Control of the Department of the Treasury, 58 Fed. Reg. 57,560, 57,560 (Oct. 26, 1993). Treasury has not amended these regulations since section 5136's enactment in 1995.

The Mint is a "bureau . . . of the Department of the Treasury," and all the Mint's "property" was transferred to the Fund, which the Treasury Secretary ultimately controls. 31 C.F.R. § 11.3(a); *see* 31 U.S.C. § 5136

(transferring all Mint "land and buildings" to the Fund and giving the Secretary control thereof); 2023 Annual Report at 42. By their plain language, then, Treasury's Randolph-Sheppard regulations cover the Mint. And if valid regulations subjected the Mint to the Randolph-Sheppard Act, the Mint would have to adhere to their terms. *Agency Rules as Constraints on the Exercise of an Agency's Statutory Discretion*, 7 Op. O.L.C. 39, 42 (1983) ("*Agency Rules*"); *see Steenholdt v. Fed. Aviation Admin.*, 314 F.3d 633, 639 (D.C. Cir. 2003).

We do not think, however, that the 1993 regulations' applicability to the Mint survived section 5136. That provision specifies, in mandatory language, that "provisions of law governing procurement or public contracts . . . *shall not* be applicable" to procurements necessary to carry out Mint programs and operations. 31 U.S.C. § 5136 (emphasis added). Duly promulgated regulations have "the force and effect of law," *Agency Rules*, 7 Op. O.L.C. at 42, and in a variety of contexts, the Supreme Court has therefore held that the word "law" encompasses regulations, *see, e.g.*, *City of New York v. FCC*, 486 U.S. 57, 63 (1988) ("The phrase 'Laws of the United States' encompasses . . . federal regulations[.]"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 295–96 (1979) (the phrase "authorized by law" includes regulations). Thus, by its terms, section 5136 encompasses Treasury's regulations as well as statutes and makes those regulations inapplicable to the Mint's procurements and public contracts.

To be sure, in some cases, regulations tracking prior statutes might survive later enactments modifying the underlying statutes; whether they do so, however, depends on the terms of the regulations and statutes and on the relevant context. *Compare United States v. Kahn*, 5 F.4th 167, 174–175 (2d Cir. 2021) (holding that, where an agency had failed to update its regulation to reflect changes to the statute that the regulation implemented, "continued adherence to the [existing] Regulation contravened both the plain language of the [amending] statute and the manifest congressional design embodied" therein (citation and quotation marks omitted)), *with id.* at 179–82 (Menashi, J., dissenting) (disagreeing and arguing that the regulation, which tracked a statutory maximum penalty, survived the later statute raising the maximum).

Here, as we have explained, section 5136's plain text expressly frees the Mint from provisions of law governing procurement and public contracts. And if regulations that merely implemented the Randolph-

Sheppard Act continued to bind the Mint across the board, that could frustrate section 5136's clear objective of conferring flexibility. Meanwhile, because Treasury justified the 1993 regulations on the ground that the Randolph-Sheppard Act left it no choice, they do not reflect a reasoned determination by Treasury that the Mint should comply with the Act now that it is not so bound. Whether or not Treasury could make such a determination—an issue we need not decide—we do not think the 1993 regulations implementing then-mandatory commands survive Congress's decision in section 5136 to expressly supersede those commands as to the Mint. *See, e.g.*, *United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017) ("Where a statute grants an agency discretion but the agency erroneously believes it is bound to a specific decision, we [cannot] uphold the result as an exercise of the discretion that the agency disavows."); *Arizona v. Thompson*, 281 F.3d 248, 259 (D.C. Cir. 2002) ("[A]n agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the agency's own judgment but rather on the unjustified assumption that it was Congress' judgment that such a regulation is desirable or required." (alterations and quotation marks omitted)).

## IV.

For these reasons, we conclude that the Randolph-Sheppard Act's priority rule does not apply to the Denver Mint.

CHRISTOPHER C. FONZONE
*Assistant Attorney General*
*Office of Legal Counsel*
